UNITED STATES of America,
Plaintiff,

v.

Bennett A. MASEL, Defendant.

No. 98–10014–X–01.

United States District Court,
W.D. Wisconsin.

June 7, 1999.

904

Robert Anderson, Asst. United States Attorney, Madison, WI, for Government.

Jeff Scott Olson, Madison, WI, for Defendant.

## OPINION AND ORDER

CROCKER, United States Magistrate Judge.

### OPINION

This case presents a First Amendment challenge to various aspects of a regulatory scheme that requires certain groups and individuals to obtain a permit prior to using or occupying National Forest System land. Plaintiff United States has charged defendant Bennett Masel with violating a regulation that prohibits non-commercial groups of 75 or more persons from occupying National Forest System land without first applying for and receiving a special use permit. 36 C.F.R. § 261.10(k). The alleged violation occurred in early September, 1998, during a gathering of the Rainbow Family of Living Light, a loose-knit, unincorporated association that gathers periodically in the national forests. Defendant, who agreed to accept the citation on behalf of the gathering, admits that the group exceeded 75 people and that they did not have a special use permit.

Before the court is defendant's motion to dismiss the citation on the ground that the regulation is unconstitutional on its face and as applied to him. Specifically, defendant contends that the regulation unconstitutionally burdens expression because it does not contain adequate procedural safeguards to limit the discretion of those administering it and is not narrowly tailored to a legitimate government interest. He also contends that the regulation is unconstitutional as applied to him because it was "legally impossible" for him to sign an application for a special use permit on behalf of the entire Rainbow Family gathering; the government failed to offer the reasonable alternative of waiving the signing requirement; and the proposed permit that was presented to him by Forest Service Officers contained provisions that exceeded the scope of the regulations.

The government responds that this court should not entertain defendant's facial challenge because he has not alleged that procedural safeguards are lacking with respect to the decision whether to grant or deny a permit in the first instance. The government maintains, moreover, that the permit scheme is a reasonable time, place and manner restriction that was constitutionally applied to the defendant.

As explained in the discussion that follows, I conclude that the challenged provisions are facially constitutional and were properly applied to the defendant. First, the terms and conditions provision presents too remote a risk of censorship to allow this court to entertain a facial challenge to the provision. Second, the permit requirement is a reasonable time, place and manner regulation that does not unduly restrict either associational or individual expressive freedoms. Finally, the regulation was properly applied to the defendant.

## I. BACKGROUND FACTS

### A. The Rainbow Family

The Rainbow Family is a loose-knit, unincorporated association that has no officers, no written articles, bylaws, constitution, rules or regulations, or any written documents of any kind. Masel Affidavit, Dkt. 6, Ex. A, ¶ 2. In fact, there are really no "members" in a formal sense. The only dividing line between who is a "member" and who is not a member is who chooses to attend and who chooses not to attend a particular gathering. *Id.*

The Rainbow Family gathers regularly in the national forests to celebrate life, to worship, to express ideas and values, and to associate with others who share their beliefs. USDA, Final Rule, *Land Uses and Prohibitions,* 60 Fed.Reg. 45,258, 45,-262 (Aug. 30, 1995) (*"Final Rule "*). Rainbow Family gatherings have occurred since at least 1980. Masel Affidavit, ¶ 3. The largest of the gatherings is the group's annual gathering which is held at an undeveloped site each summer and attracts as many as 20,000 people. *Final Rule* at 45,262. At Rainbow Family gatherings, attendees engage in a system of decision-making in open councils. Decisions are not made by vote, but by full consensus, consistent with the group's rejection of hierarchial or representative forms of government in favor of a system of universal equality. Masel Affidavit, ¶¶ 8 & 9.

At least one other court has found that the Rainbow Family, although informal and loosely-knit, nonetheless "operates as an organization, with decision-making 'councils,' individuals who [act] as agents, representatives, or leaders on a voluntary basis, and which has an informational network." *United States v. Rainbow Family,* 695 F.Supp. 294, 298 (E.D.Tex.1988).

### B. The Summer 1998 Gathering at Nicolet National Forest

In mid-August, 1998, Forest Service Officer Mark Borcovan learned that the Rainbow Family of Living Light was planning a gathering at the Secret Lake area of the Chequamegon/Nicolet National Forest in northern Wisconsin. From the time the first participants began arriving on August 18 to the time the last of them left on September 10, 1998, Officer Borcovan closely monitored the number of participants camping in the area surrounding Secret Lake.

On August 20, 1998, Officer Borcovan, District Ranger Butch Fitzpatrick, and Assistant Ranger for Resources Jeff Herrett met with two of the first people to occupy the Secret Lake site. The officers gave the individuals a copy of the Special Use Permit Application and a "Frequently Asked Questions" sheet regarding the application and permitting process. While patroling the Secret Lake area on August 29, Officer Borcovan determined that the gathering had exceeded 75 persons, therefore making it necessary for the group to apply for a special use permit pursuant to National Forest System regulations. Officer Borcovan, Ranger Fitzpatrick and Officer Brandy Sly went to the Rainbow Family site the following day, where they spoke with three participants. The officers presented the individuals with a letter that outlined resource and logistical concerns, along with two copies of a Special Use Permit Application and Special Use Permit. The individuals agreed to take the documents and present them before the Rainbow Council that evening.

On August 31, Officer Borcovan met the defendant who introduced himself as one of the individuals responsible for scouting and bringing the gathering to the forest. Other gathering attendees with whom Officer Borcovan had spoken had also mentioned the name "Ben" as one of the "focalizers" or scouts for the gathering. On September 3, 1998, Officer Borcovan spoke with the defendant and informed him that, based on the head count he had conducted on August 29, the Rainbow Family gathering would have to obtain a special use permit. Borcovan presented defendant with a copy of a permit and operating plan that was ready for signature and informed him that he would like the Council to inform the Forest Service by September 5 if they had signed the documents. Head counts on September 5 and 6 revealed that the group still exceeded 75 people. Office Borcovan met with Masel on Monday, September 7 and informed him that he was going to issue a citation pursuant to 36 C.F.R. § 261.10(j) for the group's failure to obtain a special use permit based on his count of the number of individuals in the Secret Lake area over the weekend. Defendant agreed to accept the citation on behalf of the gathering.

## II. ANALYSIS

### A. Introduction

■ The First Amendment's prohibition on laws abridging the freedom of speech is not absolute. The Supreme Court has long held that "[t]he rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place at any time." *Cox v. Louisiana*, 379

U.S. 536, 554, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). Underpinning this notion is the recognition that the exercise of civil liberties depends upon the existence of "an organized society maintaining public order;" thus, civil liberties must occasionally give way to laws "designed to promote the public convenience in the interest of all." *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). To use a real-world example, "[o]ne would not be justified in ignoring the familiar red traffic light because he thought it his religious duty to disobey the municipal command or sought by that means to direct public attention to an announcement of his opinions." *Id.*

■ When the government passes a law in an area that is within its power to control, the question becomes whether the government has overstepped its bounds and unwarrantedly abridged First Amendment freedoms. *Id.* Permit schemes that impose time, place and manner restrictions on protected expression will be upheld if the law is justified without reference to the content of the regulated speech, is narrowly tailored to serve a significant governmental interest, and leaves open ample alternative channels for communication of the information. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (citations omitted).[1] In addition, the permit scheme must contain adequate procedural safeguards to limit the discretion of the officials charged with enforcing it. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 226, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990).

### B. Regulatory Framework

The regulations at issue in this case were promulgated by the Department of

---

1. In *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the court held that a law aimed at conduct that incidentally infringes upon First Amendment freedoms is constitutional if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of that interest. *Id.* at 377, 88 S.Ct. 1673. In subsequent decisions, the Court has indicated that the *O'Brien* test differs little, if at all, from the standard applied to time, place and manner restrictions. *See Ward* at 798, 109 S.Ct. 2746.

Agriculture pursuant to 16 U.S.C. § 551, which authorizes the Secretary of Agriculture to make provisions to protect the public forests against destruction by fire and depredations and to make such rules and regulations as will preserve the National Forest from destruction by regulating occupancy and use. 16 U.S.C. § 551. More specifically, the regulations provide that all uses of National Forest System lands are "special uses." 36 C.F.R. § 251.50(a). Before engaging in a special use, one must submit an application to an authorized officer and must obtain a special use authorization. *Id.* The regulations provide that noncommercial recreational activities and noncommercial activities "involving the expression of views such as assemblies, meetings, demonstrations, and parades" are only special uses when the activity involves 75 or more people, either as participants or spectators. §§ 251.50(c)(3); 251.51.

An applicant for a noncommercial group use permit must provide a description of the proposed activity; the location and a description of the National Forest System lands and facilities the applicant would like to use; the estimated number of participants and spectators; the starting and ending time and date of the proposed activity; and the name of an adult who will sign a special use authorization on behalf of the applicant. § 251.54(e)(2)(i). The application must be received at least 72 hours in advance of the proposed activity and shall be deemed granted unless it is denied within 48 hours of its receipt. § 251.54(f)(5).

The regulations provide that a noncommercial group use application shall be granted if eight criteria are met. One of the requirements is that a person or persons at least 21 years old must be designated to sign a special use authorization on behalf of the applicant. § 251.54(h)(viii). If an application is denied because it fails to meet one of these criteria, the applicant must be notified in writing of the reasons for the denial. § 251.54(h)(2). If an alternative time, place, or manner will allow the applicant to meet the eight criteria, the government must offer that alternative. *Id.*

Each special use authorization, whether commercial or noncommercial, shall contain "terms and conditions" which will

(i) carry out the purposes of applicable statutes and rules and regulations issued thereunder; (ii) minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment; (iii) require compliance with applicable air and water quality standards established by or pursuant to applicable Federal or state law; and (iv) require compliance with State standards for public health and safety, environmental protection, and siting, construction, operation, and maintenance if those standards are more stringent than applicable Federal standards; and aesthetic values and otherwise protect the environment and require compliance with applicable air and water quality standards as well as health and safety standards.

§ 251.56(a)(1). Additionally, each special use authorization shall contain such terms and conditions as the authorized officer deems necessary to

(i) protect Federal property and economic interests; (ii) manage efficiently the lands subject to the use or adjacent thereto; (iii) protect other lawful users of the lands adjacent to or occupied by such use; (iv) protect lives and property; (v) protect the interests of individuals living in the general area of the use who rely on the fish, wildlife, and other biotic resources of the area for subsistence purposes; (vi) require siting to cause least damage to the environment, taking into consideration feasibility and other relevant factors; and (vii) otherwise protect the public interest.

§ 251.56(a)(2).

The regulations further provide that, if appropriate, each special use authorization

will specify its duration and renewability. § 251.56(b)(1). The duration shall be "no longer than the authorized officer determines to be necessary to accomplish the purpose of the authorization and to be reasonable in light of all circumstances concerning the use." *Id.* The regulation then sets forth a list of circumstances the authorized officer should consider. *Id.*

### C. Facial Challenge—Prior Restraint

#### 1. *Prior Restraints and Lakewood*

■ Defendant first contends that the special use authorization scheme is an unconstitutional prior restraint on expression. In general, a law that requires an individual to obtain a license before engaging in some form of protected speech is a prior restraint. *See Stokes v. City of Madison,* 930 F.2d 1163, 1168 (7th Cir.1991). Put conversely, a regulation constitutes a prior restraint if it gives public officials the power to deny use of a forum in advance of expression. *Ward,* 491 U.S. at 795 n. 5, 109 S.Ct. 2746. Classic examples of prior restraints include requiring a citizen to obtain a permit to parade or demonstrate, *see Shuttlesworth v. Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), requiring that films be approved by a censorship board before being shown at theaters, *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and refusing to allow the musical *Hair* to be performed at a public theater. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

■ Prior restraints are particularly disfavored and bear a heavy presumption against validity because "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." *Id.* at 559, 95 S.Ct. 1239. A law subjecting the exercise of First Amendment freedoms to the prior restraint of a license or permit must be declared unconstitutional unless it contains narrow, objective, and definite standards to guide the licensing authority. *Shuttlesworth,* 394 U.S. at 151, 89 S.Ct. 935. The rationale underpinning this doctrine "is the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). Such standardless discretion on the part of government officials is dangerous for two reasons: it intimidates parties into censoring their own speech and renders the reasons behind the licensor's decision to deny a permit "in large measure effectively unreviewable." *Id.* at 758–59, 108 S.Ct. 2138.

■ In *Lakewood,* the court enunciated a two-component standard for deciding when a facial challenge may be brought against an allegedly overbroad licensing regulation. First, the licensing law must give a government official or agency "substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." 486 U.S. at 759, 108 S.Ct. 2138. Second, "[t]he law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *Id.* With respect to the second component, the court drew a distinction between laws of general application, such as a law requiring building permits, that are not aimed at conduct commonly associated with expression and therefore present little opportunity for censorship, and those "directed narrowly and specifically at expression or conduct commonly associated with expression," like laws regulating leafletting. *Id.* at 760–61, 108 S.Ct. 2138.

■ Applying these standards, the court found two features of Lakewood's newsrack licensing scheme which, in combination, justified the allowance of a facial challenge. First, the ordinance required that newspapers apply annually for newsrack

licenses, a system that threatened the risk of censorship because it allowed the licensor to measure the probable content based on speech already uttered. *Id.* at 759–60, 108 S.Ct. 2138. Second, the licensing scheme was directed narrowly and specifically at expression or conduct commonly associated with expression, namely, the circulation of newspapers. *Id.* at 760, 108 S.Ct. 2138.

### 2. *The Special Use Authorization Scheme*

Defendant contends that the special use authorization regulations in this case must be analyzed as a prior restraint because they require noncommercial groups of 75 or more persons to apply for a special use permit as a prerequisite to exercising their First Amendment rights in the National Forest. However, defendant does not challenge the Forest Service's right to require special use permits nor does he allege that the criteria by which it decides whether to grant or deny such permits, found at 36 C.F.R. § 251.54(h), afford too much discretion to the licensor. Rather, defendant challenges § 251.56, which requires the Forest Service to attach "terms and conditions" to the special use authorization, including limitations on the duration of the special use. Clearly, these requirements become relevant only *after* the Forest Service has issued an authorization. *Cf. Black v. Arthur*, 18 F.Supp.2d 1127, 1134 (D.Or.1998), in which the court permitted Rainbow Family gathering attendees to mount a facial challenge to a regulation as a prior restraint where plaintiffs argued that the regulation failed to set standards for the type of terms and conditions the permit may contain *and* failed to set standards granting or denying permits.

The Supreme Court has suggested that a prior restraint analysis does not apply to claims of this sort. In *Ward*, plaintiffs brought a First Amendment challenge to a sound amplification guideline that the City of New York imposed upon users of the Central Park Bandshell. Rejecting the dissent's position that the guideline was an unconstitutional prior restraint, the majority found that the guideline was not a prior restraint at all because it granted no authority to forbid speech but merely permitted the city to regulate volume to the extent necessary to avoid excessive noise. 491 U.S. at 795 n. 5, 109 S.Ct. 2746. The court stated:

> It is true that the city's sound technician theoretically possesses the power to shut off the volume for any particular performer, but that hardly distinguishes this regulatory scheme from any other; government will *always* possess the raw power to suppress speech through force ... The relevant question is whether the challenged regulation *authorizes* suppression of speech in advance of its expression, and the sound-amplification guideline does not.

*Id.* (emphasis in original). In the absence of a claim that city officials enjoyed unfettered discretion to deny bandshell permits altogether, the court doubted that plaintiffs' challenge would fall within the "narrow class" of permissible facial challenges to allegedly unconstrained grants of regulatory authority. *Id.* at 794, 109 S.Ct. 2746. Plaintiffs' challenge to the sound amplification guideline, said the court, was "of an entirely different, and lesser, order of magnitude," than the facial challenges the court had permitted in the past, which "generally involved licensing schemes that vest unbridled discretion in a government official over whether *to permit or deny* expressive activity." *Id.* at 793, 109 S.Ct. 2746 (quoting *Lakewood*, 486 U.S. at 755, 108 S.Ct. 2138) (emphasis added). *See also FW/PBS, Inc.*, 493 U.S. at 246, 110 S.Ct. 596 (1990) ("Unbridled discretion with respect to the criteria used in deciding whether or not to grant a license is deemed to convert an otherwise valid law into an unconstitutional prior restraint") (White, J., concurring in part and dissenting in part). The court found it unnecessary to decide the issue, however, finding

that plaintiff's facial challenge failed on its merits. *Id.*

Like the sound-amplification guideline at issue in *Ward,* § 251.56 grants no authority to forbid speech. It merely permits the Forest Service to attach terms and conditions to the permit in order to insure compliance with otherwise applicable health and safety standards, to protect federal resources and to protect the physical safety of all those in the National Forest System. § 251.56(a). True, § 251.56 is one of several regulations that constitute the overall licensing "scheme" requiring noncommercial groups of 75 or more people to obtain a special use authorization before using the National Forest. However, in the absence of a claim that § 251.56 itself authorizes the Forest Service to deny use of the National Forest in advance of expression, defendant cannot bootstrap his way into a prior restraint claim merely because a different, unchallenged regulation provides such authorization. *See Gannett Satellite Information Network v. Berger,* 894 F.2d 61, 66 (3rd Cir.1990) (finding that, to avoid "needlessly obscur[ing] the first amendment issues raised," distinct components of regulatory "scheme" should be scrutinized independently rather than as a single totality).

Defendant contends, however, that even if § 251.56 is viewed in isolation, some of the terms and conditions that the Forest Service may impose are worded so broadly that they pose the same threat to protected expression as if such subjective criteria were used to determine whether a special use authorization should be granted in the first place. In particular, defendant contests the provisions that allow the Forest Service to impose such terms and conditions as the authorized officer deems necessary to "protect Federal property and economic interests" and "otherwise protect the public interest." Defendant argues that these ambiguously-worded conditions allow officials to "give with one hand while taking away with the other," defendant's Brief, Dkt. 6 at 21 (quoting *TJ's South,*

*Inc. v. Town of Lowell,* 895 F.Supp. 1124, 1131–32 (N.D.Ind.1995)), and that *Ward* is distinguishable because it did not involve a claim that the challenged regulation could operate effectively to silence protected expression.

Defendant's attempt to distinguish *Ward* on this basis is uncompelling. Rock Against Racism's claim that city officials might use the sound amplification guideline to provide inadequate sound for performers based on the content of their speech differs little from defendant's claim that the Forest Service may "unduly burden" a group's First Amendment rights by imposing onerous terms and conditions. On the other hand, the sound amplification guideline merely required bandshell users to use a sound system and professional sound technician provided by the city; it did not allow the city to impose additional terms and conditions as deemed necessary "to protect the public interest" or to limit the duration of the event as does the challenged regulation in this case. Thus, although similar, *Ward* is not exactly on all-fours with the instant case.

In fact, the Supreme Court has held that "[a] licensing system need not effect total suppression in order to create a prior restraint." *Southeastern Promotions,* 420 U.S. at 556 n. 8, 95 S.Ct. 1239. For instance, the court has held unconstitutional as a prior restraint a system in which an administrative board classified films as either "suitable for young persons" or "not suitable for young persons" and required exhibitors wishing to show the latter to have special licenses and to advertise their classification. *Interstate Circuit v. Dallas,* 390 U.S. 676, 688, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968). Similarly, in *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), the court held unconstitutional a system in which a non-regulatory commission charged with reviewing material "manifestly tending to the corruption of the youth" effectively engaged in informal censorship by means of persuasion and intimidation. Each of

these cases, however, presented an "as-applied" challenge to the alleged prior restraint and the record demonstrated that the functional equivalent of censorship had actually occurred. In contrast, defendant's challenge in this case is based only on the theoretical possibility that the "terms and conditions" provision may be used to chill protected speech.

Citing *Lakewood,* defendant contends that the Supreme Court has given its imprimatur to facial challenges to broadly-worded terms and conditions clauses. In concluding that the newsrack licensing scheme at issue constituted an unconstitutional prior restraint, the court in *Lakewood* found problematic a provision that allowed the mayor to attach to a newsrack permit "such other terms and conditions deemed necessary and reasonable." *Lakewood,* 486 U.S. at 769, 108 S.Ct. 2138. The court noted that under this clause, the mayor "could grant the application, but require the newsrack to be placed in an inaccessible location without providing any explanation whatsoever." *Id.*

The *Lakewood* court examined the specific language of the statute, however, only *after* it had decided to allow plaintiff's facial challenge. As stated above, the reasons the court entertained a facial challenge were twofold: 1) the ordinance required newspapers to apply annually for a newsrack license, a system that "invited" censorship; and 2) the licensing system was directed "narrowly and specifically" at expression or conduct commonly associated with expression, namely, the circulation of newspapers. *Id.* at 760, 108 S.Ct. 2138. Moreover, the newspaper also contended that the ordinance failed to place any ex-

plicit limits on the mayor's discretion to grant or deny a permit, a claim that defendant does not make here. *Id.*[2] Thus, while relevant to the issues involved in this case, *Lakewood* does not stand for the proposition that a licensing scheme that allows "terms and conditions" to be attached to a license may be challenged on its face even when there is no dispute that the scheme contains clearly defined standards for deciding whether to grant or deny a license.

In fact, application of *Lakewood* to the instant case indicates that defendant may not facially challenge § 251.56 as an unconstitutional prior restraint because the regulation is not directed narrowly and specifically at expression or conduct commonly associated with expression. Neither party has addressed this prong of the test: the government's opposition to a facial challenge rests primarily on the *Ward* dicta and Masel did not front this issue. It is undisputed that attendees at Rainbow Family gatherings engage in the types of expressive activity protected by the First Amendment. But the query under *Lakewood* is not simply whether the regulation may occasionally implicate First Amendment activities, it is whether the regulation targets them. An examination of § 251.56 reveals that it does not target First Amendment activities.

The terms and conditions provision applies to "each special use authorization." § 251.56(a). A "special use" is defined as *any* use of the National Forest System, with the exception of the disposal of timber and minerals and the grazing of livestock. 36 C.F.R. § 251.50(a). Thus, the terms and conditions clause does not tar-

**2.** Defendant's failure to make such a claim also distinguishes this case from the other "terms and conditions" cases he refers to in his brief. *See New Jersey Freedom Organ. v. City of New Brunswick,* 7 F.Supp.2d 499, 513 (D.N.J.1997) (evidence in the record showing that police department had on one occasion imposed a "special condition" on party permit "render[ed] unclear the limits actually placed on the authority of the Police Department to set conditions or *deny permits* ") (em-

phasis added); *TJ's South, Inc.,* 895 F.Supp. at 1130–32 (licensing scheme afforded too much discretion to town officials for determining whether to grant or deny permit; in addition, provision that allowed town officials to attach "conditions and safeguards" to a permit was too broadly worded); *Santa Fe Springs Realty Corp. v. City of Westminster,* 906 F.Supp. 1341, 1366 (C.D.Cal.1995) (same).

get a particular group, activity, or conduct but is directed at *all* uses of the National Forest. Such uses are listed in the regulations at § 251.53 and cover a broad spectrum of activities including archaeological sites; term permits for hotels, resorts and other structures and facilities for recreation, public convenience, or safety; easements for right-of-way for pipelines, reservoirs, energy, roads and electronic signals; operation of nordic and alpine ski areas and facilities; and various other uses. No language in the terms and conditions provision refers specifically to expression or to conduct commonly associated with expression.

Moreover, a group wishing to use the national forest for noncommercial activities "involving the expression of views such as assemblies, meetings, demonstrations, and parades" is not required to obtain a special use authorization—and consequently is not subject to any terms and conditions—unless the total number of participants and spectators is 75 or more. §§ 251.50(c), 251.50(c)(3), 251.51. The same holds true for groups engaging in noncommercial recreational activities such as camping, picnicking, hiking, fishing, hunting, horseback riding and boating. Thus, to the extent the regulation applies to noncommercial activities, it is directed not at expression, but at the congregation of large numbers of people in the forest.

One might argue that targeting large gatherings of people implicates the First Amendment's guarantee of freedom of association. But while individuals are free to associate for "any lawful purpose," *Hague v. CIO*, 307 U.S. 496, 519, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (opinion of Stone, J.), not every gathering of two or more people constitutes the sort of "expressive association" entitled to the full protections of the First Amendment. *See, e.g., Swank v. Smart*, 898 F.2d 1247, 1251 (7th Cir.), *cert. denied*, 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990) (casual chit-chat between two people not protected First Amendment activity). Rather, the first

amendment's freedom of association protects groups whose activities are explicitly stated in the amendment, such as speaking, worshiping, and petitioning the government, *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (citations omitted). Again, while many of the activities at Rainbow Family gatherings clearly implicate this type of protected activity, there is nothing in the language of the Forest Service's regulation to indicate that it is "narrowly and specifically" directed at this kind of association. Indeed, the fact that only large groups must apply for a special use authorization strongly indicates that expressive association is not the target of the regulation; it would be ridiculous to suggest that the number 75 is some sort of talismanic line that separates groups that engage in expressive association from those that do not.

Defendant suggests that a facial challenge should be allowed because the terms and conditions provision will burden groups engaging in expressive activities more than other groups. *Cf. FW/PBS, Inc.*, 493 U.S. at 215, 110 S.Ct. 596 (allowing facial challenge to licensing scheme that imposed more onerous building inspection requirements on sexually oriented businesses than on other businesses). There is nothing on the face of the regulation that supports this assertion. Nonetheless, defendant might have been able to establish that the regulation has a greater impact on expressive activities by presenting evidence showing that applicants seeking to engage in protected expression comprise a substantial portion of the pool of applicants for special use authorizations. *See, e.g., Kentucky Sports Concepts, Inc. v. Chandler*, 995 F.Supp. 767, 772 (W.D.Ky. 1998) (rejecting facial challenge to statute that required those seeking to operate a "place of entertainment" outside city limits in absence of evidence showing that significant number of applicants sought to present protected expression). But as noted above, special uses cover virtually the en-

tire spectrum of outdoor activities, the majority of which have nothing to do with protected expression. In the absence of empirical evidence demonstrating that a significant proportion of the special use authorizations granted by the Forest Service each year are for speech-related activities, there is no basis to conclude that the terms and conditions provision presents a substantial opportunity for censorship on an ongoing basis.

As the foregoing discussion makes clear, any doubt that the strong dicta of *Ward* bars plaintiff's facial challenge outright is resolved by careful application of the standards enunciated in *Lakewood*. Even accepting that the special use authorization scheme affords some discretion to Forest Service officials in imposing terms and conditions, the nexus between the terms and conditions provision and protected expression is simply too attenuated to justify a facial challenge. This provision does not even come into play with respect to noncommercial activities—including expressive activities—unless the activity will involve 75 or more people. When the provision is triggered, it applies with equal force to all special uses of the forest. Thus, the regulation is closer to a law of general application, like the building permit example in *Lakewood*, than it is to a law aimed at conduct "commonly associated with expression," such as the distribution of newspapers.

Of course, like any regulation that confers an amount of discretion upon a government official, some opportunity for censorship exists. But "[n]ot all discretionary decisions implicate the First Amendment," *Graff v. City of Chicago,* 9 F.3d 1309, 1319 (7th Cir.1993) (en banc) *cert. denied,* 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 464 (1994); it is only those that pose a "real and substantial threat" of the censorship risks identified in *Lakewood*. In this case, the "terms and conditions" provision "provide[s] too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse." *Lakewood,*

486 U.S. at 761, 108 S.Ct. 2138; *see also Roulette v. City of Seattle,* 97 F.3d 300, 305 (9th Cir.1996) (insufficient nexus where ordinance banned sitting or lying on sidewalks); *Berger,* 894 F.2d at 69 (finding rule that allowed Port Authority to decide on case-by-case basis whether a person may engage in commercial activity did not meet nexus requirement). Moreover, if charges of censorship are made, the general application of the regulation to nearly all uses of the forest "will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood,* at 761, 108 S.Ct. 2138. The risk that Forest Service officials will use nefariously any discretion afforded to them by the terms and conditions provision is not great enough to justify invoking the "extraordinary doctrine" that permits facial challenges. *See Ward,* 491 U.S. at 794, 109 S.Ct. 2746 (citing *Lakewood* at 772, 108 S.Ct. 2138 (White, J., dissenting)).

Because I am rejecting Masel's facial challenge to the terms and conditions provision, I do not reach the merits of his claim that the provision is an unconstitutional prior restraint because it fails to properly limit the decision-maker's discretion and fails to provide for prompt judicial review.

### D. Facial Challenge—Freedom of Association Claim

Defendant next contends that three provisions of the special use authorization scheme violate the First Amendment because they are not narrowly tailored to meet the Forest Service's interests. Specifically, defendant challenges the Forest Service's ability to attach terms and conditions to a special use authorization; the requirement that the special use authorization be made 72 hours in advance of a gathering; and the requirement that an adult sign an application as a representative of the group.

The parties disagree over the level of scrutiny with which this court must review the regulations. The government con-

tends that, as regulations of conduct that incidentally infringe upon the right to free speech, the regulations must be analyzed under the familiar time, place and manner standard: that is, the law must be justified without reference to the content of the regulated speech, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternative channels for communication of the information. *Ward,* 491 U.S. at 791, 109 S.Ct. 2746 (citations omitted). Other courts have reviewed the permit scheme in dispute and have concluded that it is a substantially justified time, place and manner regulation. *See United States v. Johnson,* 159 F.3d 892, 895–96 (4th Cir.1998); *Black,* 18 F.Supp.2d at 1133–34.

Defendant does not dispute that the regulations are content neutral or leave open alternative channels for communication but argues that, because the regulations implicate the right to association as well as speech, a strict scrutiny analysis must be applied. Specifically, defendant contends that the government must show that the regulations are the least restrictive means available to serve a government interest that is compelling. *See Roberts v. United States Jaycees,* 468 U.S. 609, 623, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (infringements on the right to associate for expressive purposes can be justified only if they are "adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms") (citations omitted).

■ An examination of *Roberts* and its precursors reveals that defendant's attempt to invoke strict scrutiny by way of a freedom of association claim is misplaced. The constitutionally protected right to freedom of association consists of two categories: 1) the freedom to maintain certain intimate human relations, such as marriage, procreation, education of one's children, and cohabitation with one's relatives and 2) the right to associate to engage in activities protected by the First Amendment, such as speech, assembly, petition for redress of grievances, and exercise of religion. *Roberts,* 468 U.S. at 617–18, 104 S.Ct. 3244.[3] This latter freedom of association is not set out expressly in the Bill of Rights but is a derivative right, implied from the other freedoms listed in the First Amendment. *See NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Such freedom of association protects "collective effort on behalf of shared goals," *Roberts,* at 622, 104 S.Ct. 3244, and association "in order to promote and advance common beliefs and ideas." *Elrod v. Burns,* 427 U.S. 347, 357, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). This has been referred to as the right to associate for expressive purposes. *Roberts,* at 623, 104 S.Ct. 3244.

■ In *Roberts,* the Court gave a brief list of the types of action that would constitute infringement upon the freedom of association for expressive purposes:

> Government actions that may unconstitutionally infringe upon this freedom can take a number of forms. Among other things, government may seek to impose penalties or withhold benefits from individuals because of their membership in a disfavored group; it may attempt to require disclosure of the fact of membership in a group seeking anonymity; and it may try to interfere with the internal organization or affairs of the group. By requiring the Jaycees to admit women as full voting members, the Minnesota Act works an infringement of the last type. There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together.

468 U.S. at 622–23, 104 S.Ct. 3244 (citations omitted).

3. Defendant does not contend that freedom of intimate association is implicated in this case.

In other words, government actions that will trigger strict scrutiny are those that affect the character of an organization *qua* association. The regulations at issue in this case do nothing of the sort. The challenged regulations are not directed at association or expression, but at conduct: they require large groups to apply for a permit before using National Forest system lands and to abide by the terms and conditions of the permit during the use. These requirements are applicable to all groups of 75 or more uniformly without regard to the activities or affairs of the group. Neither the terms and conditions requirement, the 72–hour provision nor the signature requirement imposes any penalties or withholds any benefits from individuals because of their membership in the Rainbow Family or in any other group. Nor do the regulations require disclosure of the fact of membership in any group or pose any threat to the internal organization or structure of a group. On their face, the provisions do not affect the ability of individuals to form associations to advocate public or private viewpoints and do not require groups to "abandon or alter" any activities that are protected by the First Amendment. *See New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 13, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988).[4]

Defendant argues that one way in which the regulation unduly burdens expressive association is by imposing "blanket liability" for violations of the terms of the permit on all the members of a group simply by virtue of his or her membership in the group. Defendant points out that the government intends that, "[b]y signing a special use authorization on behalf of the group, the agent or representative [will] give[ ] the authorization legal effect and subject[ ] the group to the authorization's terms and conditions." 60 Fed.Reg. 45274.

In support of his contention that imposition of such liability unconstitutionally burdens the right to association, defendant cites a boycott case, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982).

In that case, the Court examined whether individuals who participated in a violen-cetinged boycott of white-owned businesses could be held liable for damages sustained by those businesses as a result of the boycott. Holding that "[c]ivil liability may not be imposed merely because an individual belonged to a group," *id.* at 920, 102 S.Ct. 3409, the Court stated that "[t]he right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." *Id.* at 908, 102 S.Ct. 3409. The Court held that joint and several liability could not be imposed on all of the individuals who participated in the otherwise lawful boycott merely because some members of the group committed acts of violence. Rather, only those individuals who participated in violent or unlawful activities that proximately caused the damages could be held liable. *Id.* at 915–20, 102 S.Ct. 3409.

*Claiborne Hardware* is not directly on point. Contrary to defendant's suggestion, *Claiborne Hardware* does not stand for the proposition that a permitting body may never seek to impose lawful terms and conditions of a permit upon a group as a whole through the signature of one of its members. Rather, the case stands for the well-known prohibition against "guilt by association," namely that one cannot be found guilty (or civilly liable)simply because he associated with others who engaged in illegal conduct. In other words, defendant's reliance on *Claiborne Hardware* might have some force if he could

---

4. Indeed, it is difficult to reconcile defendant's attempt to seek protection under these freedom of association cases with his assertions that the Rainbow Family is not an "organization," has no "members," and really has no existence outside of its gatherings at which attendees "spend their time doing exactly whatever they want to do," Masel Affidavit, Dkt. 6, Ex. A.

show that the Rainbow Family or another group had obtained a special use authorization, that the Forest Service had determined that some of the terms and conditions of the permit had been violated, and that the Forest Service had ticketed every participant at the gathering instead of the individuals who actually violated the terms and conditions. In the absence of such facts, *Claiborne Hardware* is inapposite.

Defendant also contends that the regulations burden the Rainbow Family's right to association by requiring it to perform acts, such as applying for a permit 72 hours in advance of a gathering and designating an individual to sign the permit, that are practically impossible due to the amorphous nature of the group and which are contrary to the group's "core belief" in non-representative government. Indeed, despite the fact that defendant is challenging the regulations on their face, it is the alleged burdens that the regulations will impose on the Rainbow Family specifically that are the main focus of defendant's motion to dismiss. Although defendant casts these arguments in freedom of association terms, his claim that the regulations contravene the Rainbow Family's "central tenet," "core belief," or "creed," is really a derivative of a Free Exercise claim. What is at stake here for participants in Rainbow Family gatherings is not their ability to associate; what is at stake is their ability to hew unfailingly to their only true shared belief: that no participant at a gathering may speak for or act on behalf of another.

Even assuming, *arguendo*, defendant could establish that the Rainbow Family's beliefs are the equivalent of a sincerely held religious belief that would trigger the First Amendment's Free Exercise clause—a claim he has prudently not advanced, *see Wisconsin v. Yoder*, 406 U.S. 205, 216, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (philosophical and personal beliefs not grounded in religion do not rise to demands of the Religion Clauses)—he would be no better off. The Supreme Court has made clear that a non-discriminatory statute that does not affirmatively compel, by threat of penal sanctions, a person to refrain from otherwise lawful religiously motivated conduct or to engage in conduct he finds objectionable for religious reasons does not violate the Free Exercise clause. *Bowen v. Roy*, 476 U.S. 693, 706, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986); *see also Employment Div., Dept. of Human Resources v. Smith*, 494 U.S. 872, 878–79, 110 S.Ct. 1595, 1598–99, 108 L.Ed.2d 876 (1990) ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate"); *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941). Thus, the First Amendment is not violated even when a regulation, such as the permit scheme in dispute here, forces an individual to choose between obtaining a benefit offered by the government or strict adherence to his beliefs, so long as the regulation is a reasonable means of promoting a legitimate public interest. *Roy*, 476 U.S. at 708, 106 S.Ct. 2147. For example, in *Hamilton v. Regents of University of California*, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343 (1934), the Court rejected a religious challenge by students to military courses required as part of their curriculum, explaining:

> The fact that they are able to pay their way in this university but not in any other institution in California is without significance upon any constitutional or other question here involved. California has not drafted or called them to attend the university. They are seeking education offered by the State and at the same time insisting that they be excluded from the prescribed course solely upon grounds of their religious beliefs and conscientious objections to war ....

*Id.* at 262, 55 S.Ct. 197.

Similarly, the Forest Service has not forced the Rainbow Family to hold its gatherings in the national forest, nor are

National Forest System lands the only campgrounds in the United States. The Rainbow Family has a choice: if it does not wish to perform an act that is antithetical to its core belief, then it can hold its gatherings in an area that does not have a permit requirement. Defendant does not contend that the special use authorization scheme is not a reasonable means of promoting a legitimate public interest. Accordingly, the permit scheme does not violate the Rainbow Family's right to freedom of conscience.

Finally, contrary to defendant's implicit suggestion, freedom of association is not implicated simply because a regulation has an effect on expressive or conscience-motivated conduct that a group of individuals happen to be engaging in at the same place and at the same time. I highly doubt that the Supreme Court in *United States v. O'Brien* would have engaged in a strict scrutiny/freedom of association analysis of the regulation that prohibited the burning of draft cards if David O'Brien had alleged that he and his three companions were part of a group whose "core belief" or "creed" was that all draft cards should be burned. As noted above, regulations that affect the character of an association *qua* association trigger strict scrutiny; content neutral laws of general application that have an incidental effect on expression do not.

The challenged provisions fall into the latter category. As such, they are constitutional if they are narrowly tailored to serve a significant government interest. *See, e.g., Johnson,* 159 F.3d at 895–96 (applying test for time, place, and manner regulations); *Black,* 18 F.Supp.2d at 1133–34 (same); *United States v. Rainbow Family,* 695 F.Supp. 294, 309 (E.D.Tex. 1988) (applying time, place, and manner test to predecessor regulation).

E. Facial Challenge—Time, Place and Manner Analysis

■ Under the time, place and manner test, so long as the restrictions adopted are not substantially overbroad or burdensome, it is immaterial that the government's interests could perhaps be served by some less-speech-restrictive alternative. *Ward,* at 799–800, 109 S.Ct. 2746. Stated differently, if the regulation "responds precisely to the substantive problems which legitimately concern the [Forest Service]," then the court is not to second-guess whether the Forest Service could have found another way to advance its interests. *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 297–299, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Moreover, in determining whether a time, place, and manner regulation substantially serves the Government's interest, the effectiveness of the regulation should not be measured solely by the adverse consequences of exempting a particular plaintiff from the regulation. *Id.* at 296–297, 104 S.Ct. 3065; *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 652–653, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).

The regulations easily pass this test. The Forest Service has encountered a variety of problems stemming specifically from large group use of the forest, including the spread of disease, pollution from inadequate site clean-up, soil compaction from inadequate site restoration, resource damage in critical salmon habitat, resource damage in riparian zones and meadows, damage to archaeological sites and traffic congestion. *Final Rule,* Fed.Reg. 45262. There is no question that the government has a significant interest in preventing these problems from occurring and in preserving National Forest lands for the enjoyment of others. *See Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 296, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (holding that preserving national park lands for the enjoyment of others is a significant governmental interest); *Blasecki v. City of Durham,* 456 F.2d 87, 92 (4th Cir.1972) (ordinance prohibiting more than 50 people from assembling or congregating at small downtown park, which had been scene of disruptive demonstrations,

was supported by compelling interest in protecting property and avoiding congestion).

■ The provisions challenged by the defendant are narrowly tailored to meet these interests. Requiring groups to apply for a permit 72 hours in advance bears directly on the government's interests in protecting forest resources, promoting the safety and health of forest users, and allocating space among competing users. As noted in the Final Rule, allocating space has become increasingly challenging in light of increasing legal constraints on the use of forest system lands, including the need to protect endangered, threatened, or other plant and animal species. *Final Rule* at 45266. It would be extremely difficult—if not impossible—for the Forest Service to allocate space among competing users while at the same time protecting forest resources if it does not know in advance that a large group intends to gather in the national forest. Requiring a group to apply for a permit in advance is necessary so that the authorized officer can determine whether the evaluation criteria in the regulations are satisfied and to take any preventive or mitigative measures that may be necessary to reduce resource damage. *Final Rule* at 45,267, 45,272.

Paradoxically, defendant suggests that the regulation could be more narrowly tailored by making it broader, namely by expanding the permit requirement to non-commercial group uses when it is "reasonably expected" that the number of people in the group will exceed 75. Yet defendant points to nothing in the regulations that would impose any penalty upon a group such as the Rainbow Family who, uncertain about the final number of attendees, chose to apply prophylactically for a special use authorization. Because the 72–hour provision is narrowly tailored to serve the government's significant interests in protecting the national forest and allocating space among competing users,

the regulation survives constitutional scrutiny.

■ With respect to the signature requirement, requiring an individual to sign a special use authorization as a representative of the group is necessary to ensure that the group will be responsible for the actions of its members as a whole, to give the authorization legal effect and to subject the group to the authorization's terms and conditions. Without the ability to impose terms and conditions on all members of a group, the government would clearly be extremely hampered in its ability to achieve any of its interests. The terms and conditions of a group use permit would have little teeth if they only applied to the individual who signed the permit.

· Defendant suggests that the government's interests are adequately served by local, state and federal public health and safety laws and laws protecting natural resources and therefore it is unnecessary to impose additional terms and conditions on the group as a whole. I disagree. It is clear from the language of the regulation that the terms and conditions do not simply make already-existing laws applicable to group uses, but allow the Forest Service to impose rules tailored specifically to the particular site or use. For example, the Forest Service could impose a condition that restricts a group from using a particular access road due to the fact that the road is already being used for a competing use. The ability to impose such conditions is necessary in order for the Forest Service to meet its interests that arise from large group uses of the forest. As for the terms and conditions provision itself, the only argument defendant makes in support of his contention that the provision is not narrowly tailored is that its catch-all clause "could be used to limit significantly one's ability to exercise rights protected by the First Amendment." This is no different than his "prior restraint" argument, which I have rejected.

In sum, the terms and conditions provision, the 72–hour provision and the re-

quirement that an individual sign the permit on behalf of the group directly and precisely serve the government's significant interests in preserving national forest resources, protecting the health and safety of forest users, and allocating space among competing users while not unduly burdening expression. The regulations are constitutional.

### E. "As applied" Challenge

Defendant makes three arguments in support of his claim that the special use authorization requirement is unconstitutional as applied to him in this case. First, he makes a "legal impossibility" claim, arguing that because the Rainbow Family eschews any kind of representative or hierarchal government or structure, he could not sign a special use authorization application as a "representative" of the Rainbow Family without violating federal law prohibiting the making of false statements. Second, he contends that the forest service's own regulations required it to waive the permit requirement. Finally, he argues that the proposed application that was tendered to him by forest service officers contained provisions that exceeded the scope permitted by the regulations. None of these arguments carries the day.

#### 1. *Legal Impossibility*

■ Defendant's claim that it was "legally impossible" for him to sign a special use authorization as a "representative" of the Rainbow Family is without merit. His contention is similar to that raised by defendants in *United States v. Rainbow Family*, 695 F.Supp. 294, in which members of the Rainbow Family claimed that the Rainbow Family could not be sued as an entity and could not be effected by service upon one or more individuals who, at most, merely associated with the Rainbow Family on a voluntary basis. After a hearing, the court found that

the Rainbow Family, although informal and loosely-knit, nonetheless operates as an organization, with decision-making "councils," individuals who [act] as agents, representatives, or leaders on a voluntary basis, and which has an informational network.

*Id.* at 298. Moreover, the court found that even though the group lacked established leaders or agents, service of process could be effectuated upon its individual members, particularly where the individuals so served act in a leadership or representative capacity by negotiating on behalf of the Rainbow Family or "scouting" for sites for a gathering. *Id.; see also Black*, 18 F.Supp.2d at 1130 (finding that prior to Rainbow Family gatherings, which have occurred annually in different National Forests since 1972, members contact local business, civic and community organizations to prepare for the gathering). To hold otherwise, reasoned the court, "would permit organizations to maintain a fiction that they have no leaders or agents and hence evade legal process altogether, which the law will not allow." *Id.*

The same reasoning applies here: to credit defendant's argument would allow the Rainbow Family or any other group to avoid the permit requirement simply by maintaining that is had no leaders or agents that could sign the permit, thereby gutting the entire special use authorization scheme. Moreover, the record in this case indicates that attendees at the gathering identified defendant as one of the "focalizers" or "scouts" for the gathering. He also agreed to accept the citation on behalf of the group. Although the record in this court has not been fully developed as to the nature and characteristics of the Rainbow Family, these facts are consistent with the findings of the courts in *United States v. Rainbow Family* and *Black v. Arthur*, namely, that the group does allow individuals to act in a representative capacity for the group on a voluntary basis.

Based on these facts, I find that defendant is exaggerating when he suggests that he would be committing the equivalent of criminal fraud by signing the special use authorization as a representative

of the Rainbow Family. In any event, because the attendees at the gathering *could* have designated him as someone who would sign the permit on behalf of the group without breaking any laws, it was not legally "impossible" for him to sign the permit.

### 2. *Waiver*

Defendant next contends that the Forest Service should have waived the signature requirement in the instant case pursuant to 36 C.F.R. § 251.54(h)(2). That provision states that, in the event an applicant fails to meet the eight criteria required for a special use authorization— one of which is to provide the name of an adult who will sign the authorization on behalf of the group—an alternative time, place and manner must be offered if it will allow the applicant to meet the required criteria. Defendant argues that waiver would have been appropriate in this case because the gathering had exceeded the 75 person limit for several days before Officer Borcovan informed him that a permit would be required. Moreover, argues defendant, the fact that the proposed permit that was tendered to defendant to sign had already been filled in by the Forest Service indicated that the agency was in need of no specific information. Defendant contends that under these circumstances, where the permit requirement had been reduced to "a veritable mere ritual," the requirement that someone sign it on behalf of the group should have been waived.

Defendant's arguments are without merit. As the government points out, the "reasonable alternative" provision requires the Forest Service to offer an alternative that would allow the applicant to meet the eight required criteria; it does not require the agency to waive any requirements and it certainly does not require the agency to waive the permit requirement altogether. In addition, contrary to defendant's suggestion, the goal of requiring large groups to obtain a permit is not simply to gather information about the proposed use, but is also to impose on the group terms and conditions designed to protect forest resources and the health and safety of forest users. Obviously, if there is no permit, there are no terms and conditions, a result that would defeat the government's purposes behind the regulation.

Moreover, it is ironic that the defendant seizes upon the restraint, flexibility and helpfulness of the Forest Service officers to show that he is being unfairly prosecuted. The officers gave defendant every opportunity to comply with the permit requirement, including providing him with a permit that was in all respects complete except for the required signature. This has led defendant to argue that the officers should have cut him even more slack by completely ignoring the regulations that it was their duty to enforce. It is not defendant's place to determine the degree to which the officers were required to exercise their discretion in their attempt to reach a mutually acceptable solution to the permit impasse. The fact that defendant got some accommodation does not entitle him to even more accommodation from the officers. The Forest Service did not waive its right to require a permit by approaching the matter incrementally.

### 3. *Scope of tendered permit*

Finally, defendant contends that the permit that he refused to sign contained two provisions that exceeded the scope contemplated by the regulations: 1) the requirement that the Rainbow Family "maintain improvements and premises to standards of repair, orderliness, neatness, sanitation, and safety acceptable to the authorized officer;" and 2) the requirement that the group permit "free and unrestricted access to and upon the premises at all times for all lawful and proper purposes not consistent with the intent of the permit or with the reasonable exercise and enjoyment by the holder of privileges thereof." Dkt. 6, Exhibit E, ¶¶ 7 and 11. Both provisions appear to be "standard" conditions incorporated into a Forest Service form document titled "Permit."

With respect to the first condition, defendant argues that it is "vague in the extreme" and "would have allowed the Forest Service Officer to revoke the permit and disperse the gathering at any time upon purely subjective consideration." Dkt. 6 at 37. As noted in Section 2A of this opinion, however, the fact that some discretion is retained by government officials does not render a permitting scheme an unconstitutional abridgement of protected expression, particularly in the absence of any evidence to suggest that all special uses are not subject to the same condition. Moreover, to succeed on his "as applied" challenge, defendant must show that his constitutional rights were violated, not that they might have been violated.

The same overtones color defendant's claim that the condition that requires the group to allow free and unrestricted access to the premises is unconstitutional. Defendant argues that the provision effectively requires the group to agree to be subject to unreasonable searches conducted at whim by Forest Service officers. At first blush the language of the condition appears to support defendant's interpretation, for it requires access "at all times for all lawful and proper purposes not consistent with the intent of the permit or with the reasonable exercise and enjoyment by the holder of privileges thereof." Upon a moment's reflection, however, it is clear that the sentence contains a typographical error; the term "not consistent" is clearly meant to be "not inconsistent." Indeed, defendant points this out himself. The condition thus corrected would not permit the random shakedowns feared by the defendant.

In any event, if defendant had a question about the scope of this condition, he could have asked a Forest Service officer for clarification or asked that the condition be amended. There is no indication in the record that defendant pursued this course or even that the confusing language was of any concern to him until the instant litigation. Because defendant has not been harmed in any fashion by the mis-worded condition, his challenge must fail.

## CONCLUSION

Although the First Amendment guarantees absolutely one's freedom of belief or conscience, it does not guarantee absolutely the right to practice or express those beliefs at any place or any time. "[T]he very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." *Yoder,* 406 U.S. at 215–16, 92 S.Ct. 1526. Despite the fact that the Rainbow Family may practice its own form of government that rejects traditional notions of democracy, that does not render it exempt from the laws that govern the rest of us. As the Supreme Court stated more than 100 years ago,

> Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.... Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.

*Reynolds v. United States,* 98 U.S. 145, 166–67, 25 L.Ed. 244 (1878).

Although this is not a case about religion, it is a case about beliefs. However heartfelt the beliefs of those who participate in Rainbow Family gatherings, those beliefs do not allow each participant to become a law unto him- or herself. For the reasons stated above, the special use authorization scheme is constitutional, both on its face and applied to defendant.

## ORDER

For the reasons stated in this Opinion, defendant Bennett Masel's Motion to Dismiss the citation is DENIED.