UNITED STATES of America,

v.

**Joan H. KALB, Garrick M. Beck, and Stephen M. Sedlacko.**

**Nos. 99–74 ME, 99–75 ME, 99–76 ME.**

United States District Court, W.D. Pennsylvania.

March 16, 2000.

---

John J. Trucilla, U.S. Attorney's Office, Erie, PA, for U.S.

John Paul Garhart, Erie, PA, for Joan H. Kalb.

## OPINION

COHILL, Senior District Judge.

### Introduction

The three defendants above-named were each charged by Information with a misdemeanor for violation of 36 C.F.R. § 261.10(k): "Use or occupancy of National Forest lands without authorization when such authorization is required."[1]

The regulations considered here govern the noncommercial assembly of 75 or more persons in a national forest. The defendants argue that the regulations are either unconstitutional or simply don't apply to them as individuals.

We conducted a two day bench trial, and directed the parties to file proposed Findings of Fact and Conclusions of Law. In accordance with Fed.R.Crim.P. 23(c) we make the general finding that each defendant is guilty as charged and will dismiss their motions for Judgment of Acquittal. In addition, we make the following Findings of Fact and Conclusions of Law.

### Findings of Fact

For many years there have been legal skirmishes between a group known as "the Rainbow Family" and the United States Forest Service. See, e.g., United States v. The Rainbow Family, 695 F.Supp. 294 (E.D.Tex.1988). The Rainbow Family, or "Rainbow Family of Living Light," as it is sometimes called is, as one court stated:

> "... an unincorporated, loosely-structured group that regularly gathers in undeveloped sites in National Forests to pray for peace, discuss environmental and other contemporary political and social issues, and [to] exchange, develop, express, and demonstrate their ideas and views. Annual gatherings have occurred in different National Forests on and around July 4 since 1972. These gatherings draw more than 20,000 participants and last for a month or more. Smaller regional gatherings take place

1. For case in reference the applicable sections of the Code of Federal Regulations ("C.F.R.") have been reproduced in Appendix A, attached to this opinion.

throughout the year in National Forests across the country."

*Black v. Arthur,* 18 F.Supp.2d 1127, 1130 (D.Or.1998), *aff'd,* 201 F.3d 1120 (9th Cir. 2000).

The violation of 36 C.F.R. § 261.10(k) is the same charge which many defendants have faced in reported cases as a result of Rainbow Family gatherings. Participants in these gatherings consistently refuse to sign the permit application as required by 36 C.F.R. § 251.50.

The instant citations were issued to defendants Sedlacko and Beck on July 2, and to Kalb on July 5, 1999, in the Bear Creek area of the Allegheny National Forest, Pennsylvania, during a "gathering" of the Rainbow Family.

In late June and early July, 1999, some 20,000 people gathered in the Allegheny National Forest to participate in, or observe, the Rainbow Family gathering.

The Code of Federal Regulations requires noncommercial groups. of 75 or more to apply for a permit (often called a "special group use" permit) to gather in a national forest. 36 C.F.R. § 251.50(a). The application is a simple one page document, which each of the three defendants refused to sign. Gov.Ex. 6, 36 C.F.R. § 251.54.

The thrust of their defense is that no one was designated by the Rainbow Family to sign the application because the Rainbow Family is not an entity of any sort, and therefore no one can act on its behalf. Without some sort of designation or authority emanating from the Rainbow Family, so the argument goes, none of these three defendants can be responsible for the failure to obtain a permit.

The Court of Appeals for the Third Circuit has not directly addressed this question. However, this argument was recently rejected by the United States Court of Appeals for the Ninth Circuit. *Black v. Arthur,* 201 F.3d 1120 (9th Cir.2000).

The Government argues that because 36 C.F.R. § 251.51 defines "group use" as "an activity conducted on National Forest System lands that involves a group of 75 or more people, either as *participants or spectators,*" (emphasis supplied) these three defendants could be cited, since, in the opinion of the Forest Service officers who had contact with them, they not only were participants, but appeared to have leadership roles at the gathering.

William C. Fox, of Missoula, Montana, a criminal investigator for the U.S. Forest Service, was present at the Allegheny National Forest as the "incident commander" for a national team that is responsible for managing large group events in national forests. (T. 7).

He testified that when he was present at a Rainbow Family gathering in Arizona in the summer of 1998, he was informed by defendant Garrick M. Beck that the Rainbow Family would have a national gathering in the Allegheny National Forest in 1999. (T. 8). He had first met Mr. Beck in March, 1998 in Santa Fe, New Mexico. Mr. Fox said that he also saw an announcement of the 1999 gathering on the Rainbow web site on the Internet. (T. 10). Mr. Fox was quite familiar with these events, having first attended a Rainbow Family gathering in 1992 in Colorado. (T. 10). He knew that there were occasional regional Rainbow gatherings as well as national ones (T. 12), and in conversations with Beck he learned something of the internal organization of the Rainbow Family; it was then that Beck suggested that Fox work with a group he called the "peace keepers", or "Shanti–Sena" of the Rainbow Family, in anticipation of the Allegheny Forest Gathering. An exhibit entitled "Rainbow Guide" (Gov.Ex.3) describes the so-called councils thus:

**COUNCILS**

We gather in council circles to voice and creatively resolve the issues and concerns of our ever evolving Gathering. Participation in a council requires a focused mind, a listening ear and an open

heart as we make critical decisions on how to best serve the Gathering. The power to listen is sacred to the process.

Councils occur regularly on all workings of the gathering. They include: Main Council, Coop Council, Vision, Clean-up, Legal team, Shanti Sena, CALM, Info, Rainbow Guide, All Ways Free, Focalizers, Kitchens, firewatch, Bus Village and any other special event, issue or aspect.

Councils are excellent opportunities to help create the Gathering.

In addition to this description of the Councils, there is also a description of the "Main Council" at page 8 of the Rainbow Guide:

## MAIN COUNCIL

Main Council is held at rainbow noon in Main Meadow to deal with the business of the Gathering and provide an open forum for anyone and announced by 3 repeated blowings of the conch shell. It is the only time decisions affecting the Gathering can be made.

With the evolution of diverse councils caring for the many needs of the village the question is asked. "Where is Main Council now?"

There was a time when it lasted for days without end. We shared openly what we were learning during the eco-psychedelic revolution. We expressed fears or anger and went away clearer. We addressed all issues, focused our heart songs, and healed our relations. We gave room for all people to share our experience and we were healed. With enthusiasm we unlocked the mysteries of why we were together as a Rainbow People. Maybe the time to sit together in this way has come again?

At Main Council in New Mexico it was consensed (sic) that the Annual Gathering and the council should begin on June 21 and end on July 10 allow more time to synthesize our community and The Rainbow Family Tribal Council. Seven days goes by quickly. A longer Main Council would lead to a clearer vision of the tribal village. A strong tribal coalition can transform unconsciousness and archaic forms of decision-making into creative enlightened potentials.

This controversial decision begged us to look at the purpose and form of Main Council.

Now with twenty days of council, what can we do? Its up to you. Participate and help redefine Main Council.

Mr. Fox also identified a Rainbow Family manual on how to put on a gathering. (Gov.Ex.1). He had also printed his own copy of the manual from the Rainbow web site. This exhibit defines Shanti–Sena (the group Mr. Beck suggested Mr. Fox work with) as follows:

### Shanti–Sena

Shanti–Sena means "Peace Center"! There are no "Rainbow Police." We are secure because we watch out for each other. We are All Shanti–Sena. Experienced Shanti–Sena hold regular peace keeping workshops which everyone is encouraged to attend at least once. Do you know what to do in an emergency?

The Rainbow Family appears to base much of its organization and activities on the ways of the American Indians, or Native Americans as they are sometimes called. The manual states in part: *"There is no authoritarian hierarchy here.* We have a tribal anarchy where we take care of each other, because we recognize that we are all *O* ne." (Gov.Ex.1). It also states:

### Gathering on Public Lands

Our Permit to Gather reads as follows: "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof or abridging the freedom of speech or of the press or the right of the people peaceable (sic) to assemble and to petition the government for redress of grievances."

Gov.Ex. 2 is an announcement of the Allegheny Forest gathering, titled "Rainbow Gathering of the Tribes for World

Peace & Healing. June 28–July 10, 1999, Allegheny National Forest, Pennsylvania." It contains directions to the Allegheny National Forest and, among other things, suggestions as to what participants should bring to the gathering.

On the last page this underlined statement appears: *"Please do not sign any permits for 'Rainbow Family Gathering.'"*

The announcement continues:

" 'Congress shall make no law respecting ... religion, speech, press; or the right of the people peaceably to assemble.' Do administrated (sic) agencies now have powers that the Constitution specifically withheld from Congress? Applying for 'permits' gives authority to 'authorities' to participate in the 'control' of people assembling and 'permit' a strong 'police presence' and the further ends of the 'control' agenda are met!"

In addition, Mr. Fox identified a "Rainbow Guide." (Gov.Ex.3). On the front page is a picture of a man and woman sitting in front of a teepee. The Guide contains more details on gatherings, definitions, words and phrases used by the Rainbow Family, and the names and addresses of "Focalizers," people "who let know what's happening where and when, and who you want to contact when you have info to share. Please remember these people are cool and can use much help in the efforts of focalizing."

Many of the names of people listed as focalizers are simply a first name, such as "Mark" or "Paul" with an address. Others sound like Indian names: "Flickerfeather, Squirrley Possum," "Sun Beat," etc.

At the end of the Guide (page 37) is a form where a person may state his/her name, address, and list, among other things, community, trades, crafts, skills, and projects, and "needs." It states "Contribution $____. A $4.00 donation will help create a quality guide." The form is to be sent to:

The Rainbow Guide
P.O. Box 1016

Hackensack, N.J. 07602–1016

Mr. Fox testified that he had met "focalizers" both in 1998 and 1999. They let the Forest Service know "where the kitchens were going to be located, where certain individuals were located if we needed to contact somebody. There were times when people stepped forward saying, you know, we're not going to sign, you know, a permit. We're not going to submit an application." (T. 22).

"The focalizer tended to do all of the speaking and the other folks just would sit there and listen. Generally it was the focalizer that I would have the conversation with." (T. 22).

Mr. Fox identified the defendant. Joan H. Kalb, as the focalizer listed in the Guide as "Joanee Freedom." (T. 23). Mr. Fox stated that defendant Garrick M. Beck never identified himself as a focalizer, "... but clearly, during the couple of years that, you know, year and a half, that I've known Garrick, he is an individual who is very articulate and very involved with the gatherings. Attended a number of the gatherings himself, and clearly he was an individual, in my opinion, that knows what's going on at these gatherings." (T. 23, 24).

Mr. Fox testified, and we find, that by mid June there were over 75 people at the gathering, and by July 2 to July 5 there were approximately 20,000 people present. (T. 27).

Mr. Fox, in 1998, had told Mr. Beck that the Forest Service was going to require a permit for the 1999 gathering, and he stated that they had also discussed the subject several times in 1999. Each time Beck said they would not apply for a permit. (T. 29).

On or about June 17, 1999, there was a meeting in Ridgway, Pennsylvania, which was the town closest to the gathering. It was convened by the Pennsylvania State Police and some local citizens who were concerned about the impending gathering.

About 300 local citizens attended. Mr. Beck attended the meeting and described "who the Rainbows were, and why they were there." (T. 34).

Robin L. Poague, a special agent with the Forest Service, from Glynoco, Georgia, testified that he first came in contact with the Rainbow Family in the spring of 1995 at a gathering in Arizona. (Vol.II, T. 14). On or about June 17, 1999, Mr. Poague spoke with Mr. Beck, who he had met at the 1995 Arizona gathering, Mr. Poague was accompanied by a local Forest Ranger, John R. Schultz. Mr. Schultz had a package containing an application for a group use permit, a copy of the applicable Code of Federal Regulations and a letter addressed to "Rainbow Family Gathering" from John E. Palmer, Forest Supervisor. (Gov.Ex. 6, hereinafter referred to as the "Permit Package"). The letter set forth the need and method to apply for a permit. (Vol.II, T. 19). Ranger Schultz handed the package to Mr. Beck.

Mr. Beck told Mr. Poague and Mr. Schultz that he wanted to take the issue of the permit to the Council.

In early July (probably July 2, 1999) Mr. Poague encountered the defendant Stephen Sedlacko for the first time. (Vol.II, T. 23). Officer Poague was looking for Beck to find out the decision about the permit, and Sedlacko agreed to arrange a meeting with Beck. Later in the afternoon (July 2, 1999) he met with Sedlacko and Beck (Vol.II, T. 26).

Poague told Beck that he was going to cite him for failure to obtain a permit; Beck said he would accept a citation, but didn't want to be cited alone, whereupon Sedlacko volunteered to be cited also. (Vol.II, T. 27). Mr. Poague also knew Mr. Sedlacko by the name "Steven Principle." (Vol.II, T. 27).

Beck proposed that volunteers be provided by the Rainbow Family to accept the citations, which offer Poague refused. Forest Service Officer Steven S. Burd, who was also present, then issued citations to Messrs. Beck and Sedlacko. (Gov.Ex. 10 and 11) (Vol.II, T. 129).

Mr. Sedlacko had written a column in a Rainbow tabloid (Gov.Ex.7) under the name "Stephen Principle" with the headline: " 'Permit'-tion and our right to gather." On the opposite page was a column entitled "Legally Speaking" which purported to report a conversation between Stephen Principle and one Scottie Addison, discussing "unfavorable" court rulings on the permit issue.

Ranger John R. Schultz testified regarding defendant Joan Kalb, who had first been identified to him as "Joanie Freedom." Mr. Schultz is stationed at the Allegheny National Forest, but had attended other Rainbow gatherings. (Vol.II, T. 79).

The circumstances of the initial meeting with Ms. Kalb were these: On May 29, 1999, Ranger Schultz and one of his staff. Arnie Irvine, went out to the location of the gathering. They had heard that the Rainbow Family was having a spring council meeting, and they wanted to locate where it might be. They came upon a group of forty to fifty people who were talking. (Vol.II, T. 79). Ms. Kalb "pinched off" the conversation and invited the officers to speak to the group. Schultz discussed the need for a permit with Ms. Kalb and the group for about an hour and a half. (Vol.II, T. 81). He attempted to present the Permit Package, but no one would accept it. (Vol.II, T. 83).

Officer Schultz met Ms. Kalb again on June 11, 1999, and attempted to present the Permit Package. Again, no one present would accept it, so he left it on the ground in front of the group. (Vol.II, T. 83).

On June 12, 1999, he again met with Ms. Kalb, "didn't make any progress on the permit issue itself," but then discussed in detail with her resource management plans as well as the operational aspects of the gathering. (Vol.II, T. 83, 84).

On July 5, 1999, at the direction of Officer Schultz, Officer Burd issued a citation to Ms. Kalb. (Vol.II, T. 132).

It is clear from the testimony of the government witnesses that there was never any animosity or acrimony between the Forest Service personnel and the defendants; indeed, they were on a first-name basis. The defendants simply refused to sign the permit application when requested to do so by the officers after lengthy conversations with them.

It is also clear from the trial testimony and the exhibits that there is quite a complete internal organization of the Rainbow Family in the form of the Councils and committees. The members simply attempt to avoid the permit application requirements by refusing to designate an applicant.

### Conclusions of Law

The main thrust of the defendants' argument is that they cannot be cited as individuals since they have not been designated by the Rainbow Family to act on the group's behalf. According to the defendants' brief, page 13, the group "refused" to designate anyone to act, therefore these defendants are immune from prosecution. This argument was discussed and rejected by a court of appeals as recently as February 9, 2000. *Black v. Arthur*, 201 F.3d 1120 (9th Cir.2000). *See also, United States v. Masel*, 54 F.Supp.2d 903, 920 (W.D.Wis.1999); *United States v. Rainbow Family*, 695 F.Supp. 294, 298 (E.D.Tex. 1988).

The defendants have not only fit the definition of "participants" in this gathering but also, as discussed in our Findings of Fact, had leadership roles as spokespersons for the Rainbow Family. They are certainly valid objects of prosecution.

The defendants further argue that the noncommercial group use regulation is unconstitutional in that it abridges their rights under the First Amendment. This proposition has also been rejected. "The exercise of civil liberties depends upon the existence of 'an organized society maintaining public order;' thus civil liberties must occasionally give way to laws 'designed to promote the public convenience in the interest of all.'" *Masel*, 54 F.Supp.2d at 907 (quoting *Cox v. State of New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049, (1941)).

The Fourth Circuit Court of Appeals thoughtfully discussed this issue in *United States v. Johnson*, 159 F.3d 892 (4th Cir. 1998). The case arose, as so many other "Rainbow Family cases" have, this time, during a gathering in the Pisgah National Forest, North Carolina.

Four individuals were cited for their refusal to apply for a special use permit. One of their defenses was that the Forest Service permit requirement violated their First Amendment free speech and freedom of association rights. They argued that the regulations were unconstitutional because they burdened "substantially more expression than necessary to further the government's legitimate interests." 159 F.3d at 895 (quoting from appellants' brief). The law is clear that when "expressive conduct" occurs on public grounds, the government can impose reasonable "time, place and manner" restrictions. *Ward v. Rock Against Racism*, 491 U.S. 781, 789, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Furthermore, such restrictions are constitutionally valid "as long as they are (1) content neutral, (2) 'narrowly tailored to serve a significant governmental interest,' and (3) 'leave open ample alternative channels for communication of the information.'" *United States v. Johnson*, 159 F.3d at 895, quoting *Ward*, 491 U.S. at 791, 109 S.Ct. 2746; *see also Forsyth County, Georgia v. Nationalist Movement*, 505 U.S. 123, 129–30, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). The court then went on to hold that the regulations clearly serve three purposes: to protect resources and improvements on National Forest System lands, allocate space among potential or existing uses and activities, and read-

dress concerns of public health and safety. *Id.* at 895; 60 Fed.Reg. 45, 258, 45, 262 (1995).

The opinion then stated: "The permit serves these three purposes in a narrowly tailored manner by providing a minimally intrusive system to notify Forest Service personnel of any large groups that will be using the forest so that the personnel, through advance preparation, can minimize any damage that may occur." *Id.* at 896.

■ The national forest lands are a precious asset of this nation. While the members of the Rainbow Family may regard the environment as something to be guarded and treasured, and while they may be conscientious about protecting those lands when they are present on them, other groups may not be. It would be an impossible assignment for the Forest Service to predict that one group will not harm a national forest and that another group might. There must be some method in place to maintain "the public order;" it is not an abridgment of First Amendment freedoms if the law is narrowly tailored to serve a significant governmental interest. *Ward*, 491 U.S. at 791, 109 S.Ct. 2746; *Masel*, 54 F.Supp.2d at 907. We thus reject the argument that the requirement of a permit is violative of the First Amendment.

■ Defendants also argue that the term "group use" as defined in 36 C.F.R. § 251.51 is "vague and overbroad." This is another argument advanced in many Rainbow Family cases; it likewise has been analyzed by the courts and then dismissed. *See Black*, 18 F.Supp.2d at 1132 and cases cited therein. From the many examples in the Rainbow Family printed material, as quoted in our Findings of Fact, it is clear that the Rainbow Family is a well organized group. We thus reject the argument that their use of national forest lands is not a "group use."

The defendants, in their supplementary brief, have raised a facial challenge to the regulations, citing *United States v. Linick,*

195 F.3d 538 (9th Cir.1999). In *Linick* a district court judge had considered a Rainbow Family facial challenge to 36 C.F.R. § 251.56(a)(2)(vii). This is the provision that states in pertinent part: "Each special use authorization shall contain:

    \*\*\*

    (2) Such terms and conditions as the authorized officer deems necessary to .... (vii) otherwise protect the public interest."

In that case two members of the Rainbow Family were charged in an information with use of the Apache–Sitgreaves National Forest, Arizona, in June, 1998, without a permit. The district court granted the defendants' motion to dismiss, ruling that the quoted section gave Forest Service officers "impermissibly broad discretion in violation of the First Amendment" and was therefore unconstitutional on its face. *Linick*, 195 F.3d at 541.

The Court of Appeals for the Ninth Circuit affirmed the dismissal of the citations, relying particularly on *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). In that case a city ordinance gave the mayor of Lakewood the authority to grant permits to place newsracks on public property. The ordinance allowed the mayor to attach to the permit any "terms and conditions deemed necessary and reasonable." *Id.* at 754, 108 S.Ct. 2138. The Supreme Court suggested that this resulted in the mayor having "impermissible discretion to deny expressive activity." *See id.* at 769, 108 S.Ct. 2138.

The Ninth Circuit Court then took an unusual step. The gathering in question had occurred in June, 1998. In September, 1999 (perhaps in response to the holding of the district court in *Linick* ), the Forest Service issued an interpretive rule relative to 36 C.F.R. § 251.56. *See* Fed. Reg. 48,959. The rule stated in relevant part:

The imposition of terms and conditions in noncommercial group use permits is

limited to those designed to further the three public interests identified by the Forest Service in promulgating the non-commercial group use rule, i.e., the need to address concerns of public health and safety, to minimize damage to National Forest System resources, and to allocate space among actual or potential uses and activities.

■ The court then went on to hold that the interpretive rule served to preserve "the constitutionality of the regulatory scheme because the scheme now satisfies the three-part test for time-place-manner regulation." *Linick*, 195 F.3d at 543.[2]

However, the interpretive rule came more than a year after the citations were given to the defendants. Thus, the court held that while the interpretive rule now preserved the constitutionality of the regulation, it was not retroactive in effect. The court then affirmed the district court on its dismissal of the information, but reversed the district court's ruling that the regulation itself was unconstitutional.

The chronology in the case at bar is similar to that in *Linick* —the September, 1999, interpretive rule came after the July, 1999 Rainbow gathering in the Allegheny National Forest. The defendants thus argue that we should follow *Linick* and dismiss the charges.

We respectfully decline to follow *Linick*. We believe the reliance of the Ninth Circuit court on *Lakewood* is misplaced. The Lakewood ordinance was aimed directly at the placement of newspaper stands, so of course, carried to its logical extreme, the mayor was given the unfettered power to prohibit or otherwise control where news could be dispensed, a direct assault on the First Amendment both in terms of free-

dom of the press and freedom of expression.[3]

We do not see how such infringement could carry over to the Forest Service permit considered here. The language *Linick* held to be objectionable was that which stated that the permit could contain "such terms and conditions as the authorized officer deems necessary to ... (iii) otherwise protect the public interest."

The Ninth Circuit Court of Appeals speculated that "the Forest Service's broad discretion to attach terms and conditions to a permit can be abused in a manner that could limit the use of public lands by parties who hold political views that are disfavored by the Forest Service." *Linick*, 195 F.3d at 542. We feel that it is a stretch to say that *Lakewood* should be precedent for a holding that the language in question was facially unconstitutional. In any event, we need not reach the effect of the interpretive rule. Even without it, the regulation was clearly intended to regulate conduct relative to public health and safety, not speech or expression.

We therefore decline to follow the holding in *Linick*.

### Conclusion

The defendants are guilty as charged. It would be impossible to estimate the judicial resources that have been expended through the years in the many legal contests between the Rainbow Family and the Forest Service. In this case alone, Forest Service personnel from Georgia and Montana had to be separated from their regular duties to come to Pennsylvania to testify, as did personnel assigned to duties in the Allegheny National Forest. Obviously, scarce resources of the Court, the Justice Department and the Forest Service have

---

**2.** As previously noted, *infra*, the government may regulate the time, place, and manner of expressive activity in a public forum, so long as the regulatory scheme is (1) content-neutral; (2) narrowly tailored to serve a significant government interest; and (3) leave open "ample alternatives for communication." *Forsyth County, Georgia v. Nationalist Movement*, 505 U.S. 123, 129–30, 112 S.Ct. 2395,

120 L.Ed.2d 101 (1992); *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

**3.** Although we agree with the holding in *Lakewood*, it was a close 4–3 decision with two justices not participating.

518

been expended to handle this case and the many others involving the Rainbow Family through the years, and always over the same issue—refusal to apply for a permit.

Perhaps the Ninth Circuit Court of Appeals considered the interpretive rule, when it was not even an issue in the *Linick* case, in the hope of heading off yet another Rainbow Family case which might challenge the efficacy of the new interpretive rule at sometime in the future.

It's not as if the issues considered here were "landmark" in nature; time and again the Rainbow Family has made the same arguments and had them rejected by courts all over the United States.

While the "mouse-that-roared" syndrome sometimes has the appeal of tweaking the authorities on the nose, we hope that the time to stop has finally arrived.

*Appendix A*

For ease in reference, the applicable sections of the Code of Federal Regulations are set forth here.

**36 CFR § 251.50 Scope**

(a) ... Before engaging in a special use, persons or entities must submit an application to an authorized officer and must obtain a special authorization from the authorized officer ...

**36 CFR § 251.51 Definitions**

"Applicant"—any individual, partnership, corporation, association ... which applies for a special use authorization.

"Group Use"—an activity conducted on National Forest System lands that involves a group of 75 or more people, either as participants or spectators.

"Holder"—any applicant who has received a special use authorization.

"Noncommercial use or activity"—any use or activity that does not involve a commercial use or activity

"Special use authorization"—a permit .... which allows occupancy, use, rights

or privileges of National Forest System land.

**36 CFR § 251.54 Proposal and application requirements and procedures**

\*\*\*

(d) Proposal content—

(1) Proponent identification. Any proponent for a special use authorization must provide the proponent's name and mailing address, and, if the proponent is not an individual, the name and address of the proponent's agent who is authorized to receive notice of actions pertaining to the proposal.

(2) Required information—

(i) Noncommercial group uses ... A proponent for noncommercial group uses shall provide the following:

(A) A description of the proposed activity;

(B) The location and a description of the lands and facilities the proponent would like to use;

(C) The estimated number of participants and spectators;

(D) The starting and ending time and date of the proposed activity; and

(E) The name of the person or persons 21 years of age or older who will sign a special use authorization on behalf of the proponent.

\*\*\*

(g) Application processing response.

\*\*\*

(3) Response to applications for non-commercial group uses.

\*\*\*

(ii) An authorized officer shall grant an application for a special use authorization for a noncommercial group use upon a determination that:

\*\*\*

(H) A person or persons 21 years of age or older have been designated

to sign and do sign a special use application on behalf of the applicant.

The 1998 version:

**36 CFR § 251.56 Terms and conditions.**

(a) General. Each special use authorization shall contain:

\*\*\*

(2) Such terms and conditions as the authorized officer deems necessary to (i) protect Federal property and economic interests; (ii) manage efficiently the lands subject to use or adjacent thereto; (iii) protect other lawful users of the lands adjacent to or occupied by such use; (iv) protect lives and property; (v) protect the interests of individuals living in the general area of the use who rely on the fish, wildlife, and other biotic resources of the area for subsistence purposes; (vi) require siting to cause least damage to the environment, taking into consideration feasibility and other relevant factors; and (vii) otherwise protect the public interest.

The 1999 version contains exactly the same language, except that the numbers and letters denoting this section are different.

**36 CFR § 261.10 Occupancy and use.**

The following are prohibited:

\*\*\*

(*l*) Use or occupancy of National Forest System land or facilities without special use authorization when such authorization is required.