

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-12-2000

# United States v. Kalb

Precedential or Non-Precedential:

Docket 00-1733

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v. Kalb" (2000). *2000 Decisions.* Paper 246.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/246

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 12, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-1733, 00-1734 and 00-1746

UNITED STATES OF AMERICA

v.

JOAN H. KALB,
        Appellant in No. 00-1733

(D.C. Crim. No. 99-cr-00074E)

UNITED STATES OF AMERICA

v.

GARRICK M. BECK,
        Appellant in No. 00-1734

(D.C. Crim. No. 99-cr-00075E)

UNITED STATES

v.

STEPHEN M. SEDLACKO,
        Appellant in No. 00-1746

(D.C. Crim. No. 99-cr-00076E)

Appeal from the United States District Court
for the Western District of Pennsylvania
District Judge: Honorable Maurice B. Cohill, Jr .

Argued
October 26, 2000

Before: MANSMANN, ALITO and FUENTES, Cir cuit Judges.

(Filed December 12, 2000)

David W. Ogden
 Assistant Attorney General
Harry Litman
 United States Attorney
Michael J. Singer, Esquire
Howard S. Scher, Esquire
United States Department of Justice
Civil Division, Appellate Staff
601 D Street, N.W.
Washington, D.C. 20530-0001

Benjamin P. Cooper, Esquire
 (Argued)
United States Department of Justice
Civil Division
P.O. Box 883
Washington, D.C. 20044

 COUNSEL FOR APPELLEE

John P. Garhart, Esquire
 (Argued)
1001 State Street
Renaissance Centre
Erie, PA 01651

 COUNSEL FOR APPELLANTS
in Nos. 00-1733 and 00-1734

Bruce A. Antkowiak, Esquire
 (Argued)
One Northgate Square
Greensburg, PA 15601

 COUNSEL FOR APPELLANT
in No. 00-1746

OPINION OF THE COURT

MANSMANN, Circuit Judge.

These appeals comprise the latest installment in a series
of legal skirmishes waged between the gr oup known as

2

"The Rainbow Family" or "The Rainbow Family of Light" and the United States Forest Service. Garrick Beck, Joan Kalb, and Stephen Sedlacko, participants in a 1999 Rainbow Family gathering, appeal from Judgments in Criminal Cases entered following the conviction of each of a misdemeanor violation of 36 C.F.R. S 261.10(k): "Use or occupancy of National Forest System land or facilities without special-use authorization when such authorization is required." These appellants challenge the Forest Service regulations, arguing that the relevant regulations do not apply to them as individuals and, in the alter native, that the regulations are constitutionally infirm both facially and as applied. Because we are convinced that the challenged regulations were properly applied to the individual appellants and do not transgress constitutional requirements, we will affirm the Judgments in a Criminal Case entered by the District Court.

I.

The facts underlying this appeal are set forth in detail in the opinion of the District Court, United States v. Kalb, 86 F. Supp. 2d 509 (W.D. Pa. 2000). Accor dingly, our recounting of the facts is brief. For a period of weeks during the summer of 1999, some 20,000 people attended a Rainbow Family1 gathering in Pennsylvania's Allegheny National Forest. Each of the appellants was pr esent at that gathering and was identified by a Forest Service criminal

_____

1. The Rainbow Family has been described in other litigation as:

     . . . an unincorporated, loosely structured gr oup of individuals that
     regularly gathers in undeveloped sites in National Forests to pray for
     peace, discuss environmental and other contemporary political and
     social issues, and [to] exchange, develop, express and demonstrate
     their ideas and views. Annual gatherings have occurr ed in different
     National Forests on and around July 4 since 1972. These gatherings
     draw more than 20,000 participants and last for a month or more.
     Smaller regional gatherings take place thr oughout the year in
     National Forests across the country.

Black v. Arthur, 18 F. Supp. 2d 1127, 1130 (D. Or. 1988), aff 'd, 201 F.3d 1120 (9th Cir. 2000) (inter nal citations omitted).

investigator as having had some role in organizing or administering the event.

In early July 1999, these three individuals were issued citations charging each with use of Forest Service land without special use authorization in violation of 36 C.F.R. S 261.10(k).2 Related regulations provide that such "special use authorization" must be obtained for "noncommercial group uses." Id. S 251.50. "Special uses" include all uses other than timber harvesting, grazing and mineral extraction. Id. "Group use" is defined as "an activity conducted on National Forest System lands that involves a group of 75 or more people, either as participants or spectators." Id. S 251.51.

The application for a permit is a simple one-page document which essentially requires the applicant to supply information concerning the location and description of the National Forest System land upon which the activity will take place, the facilities that the applicant seeks to use, the estimated number of participants and spectators, the starting and ending times and dates for the proposed activity, and the name of an adult who will sign a special use authorization on behalf of the applicant. Id. S 251.54.

Each of the appellants was advised by a Forest Service representative of the need for the Rainbow Family to apply for a special use permit and was asked to sign the permit application. Each refused.

In August 1999, the appellants were charged with violating the Forest Service regulations and, after a two-day bench trial in October 1999, each were found guilty. On June 1, 2000, each of the appellants was sentenced to a three-month term of imprisonment and was directed to pay a special assessment. A $500 fine was assessed against two of the appellants.3 These sentences were stayed pending the

_____

2. A number of Forest Service regulations were recodified in 1999. These changes altered the numbering of relevant sections. Because the District Court and the parties have consistently referred to these regulations by their original numbers, we do the same.

3. The penalty provision of the regulatory scheme, 36 C.F.R. S 261.1b provides that:

4

filing and resolution of any appeal. These timely appeals followed and were consolidated for disposition.

II.

The appellants raise a number of challenges to the Judgments entered against them. We consider these challenges seriatim, mindful that because of the"many legal contests between the Rainbow Family and the Forest Service," we do not write on a blank slate. Kalb, 86 F. Supp. 2d at 517.

We address first the contention that the regulations underlying the appellants' convictions criminalize only group rather than individual conduct: "This statute has no actus reus element that can be committed by an individual."

We reject this position because it is unnecessary that the statute specifically set forth the individual as the actor as opposed to the group; the statute need not begin "No person shall . . ." (as appellants argue) for individual liability to attach to a violation. The liability of an individual -- or a group -- occurs when the four r equirements of the statute are proven.

Not one court considering the application of 36 C.F .R. S 261.10(b) has hesitated to apply that section to individual defendants. We are not persuaded to chart a different course here. In rejecting the appellants' argument, we are guided by the opinion in United States v. Johnson, 159 F.3d 892 (4th Cir. 1998). There, the court clarified that proof of a violation of section 261.10(k)

> requires the government to demonstrate: 1) use, 2) of National Forest land, 3) by a noncommerical gr oup of 75 or more persons, either as participants or spectators, 4) without special use authorization.

_____

> Any violation of the prohibitions of this part (261) shall be punished by a fine of not more than $500 or imprisonment for not more than six months or both pursuant to title 16 U.S.C. section 551, unless otherwise provided.

5

Id. at 894. The record demonstrates that these requirements were satisfied with r espect to each of the appellants. Each knew of the permit requirement, that the gathering of which they were a part was lar ge enough to implicate that requirement,[4] and that an application for a permit had not been made. Armed with that knowledge, these individuals could have avoided liability under the regulations by opting not to participate in the gathering on National Forest land where it was clear that a special use authorization was required and had not been granted. The record is devoid of any indication that it was "imperative for [the] Rainbow Family to gather in a national forest, as opposed to some other location, to pray and to discuss their views." United States v. Linick, 195 F .3d 538, 543 (9th Cir. 1999).

To read the regulation and the penalty for its violation as inapplicable to individuals who use the National For est System as part of a group, with deliberate disr egard for the group permit requirement, would effectively eviscerate the special use authorization process. We decline to do so.

III.

The appellants next attack particular aspects of the regulations on constitutional grounds, ar guing first that the regulations are impermissibly vague and overbroad because they fail to establish standards for the public and for those enforcing the regulations "sufficient to guard against the arbitrary deprivation of liberty interests." City of Chicago v. Morales, 527 U.S. 41, 52 (1999).

"It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits. . . ." Id. at 56 (quoting Giaccio v. Pennsylvania, 382 U.S. 399, 402, 403 (1966)). The

_____

4. The appellants do not contend that they wer e not part of the "group" that used the forest. Thus, this is not a case in which an individual is charged under the regulation simply because he or she happened to be in the same location with 75 or more persons who belonged to a "group" of which the individual is not a part.

6

regulations here do not foster uncertainty. Unlike the ordinance at issue in Morales, the r egulations clearly define what conduct is prohibited; there is no need for speculation.5 Accordingly, we reject appellants' allegation that the regulatory scheme is unconstitutionally vague.

IV.

The appellants next contend that the regulation requirement that a special use authorization permit be signed by a member of the group burdens the First Amendment rights of individuals attending a Rainbow Family gathering. According to the appellants,"[t]he challenged regulation is unconstitutional because it is not narrowly tailored to serve a significant governmental purpose nor does it leave open ample alternate channels of communication." By now there is a body of caselaw addressing the constitutionality of the signature requirement; this requirement has been upheld uniformly and we will uphold it here.

Even where expressive conduct takes place in a public forum, the government may impose reasonable "time, place and manner" restrictions on that conduct. United States v. Johnson, 159 F.3d at 895 (citing W ard v. Rock Against Racism, 491 U.S. 781, 789 (1989)). These r estrictions comport with constitutional requirements if they (1) are content neutral; (2) are "narrowly tailored to serve a significant governmental interest," and (3) "leave open ample alternative channels for communication of the

_____

5. The Supreme Court in Morales considered the constitutionality of Chicago's Gang Congregation Ordinance. This ordinance prohibited " `criminal street gang members' fr om `loitering' with one another or with
other persons in any public place." 527 U.S. at 45-56. "Loitering" was defined as "remain[ing] in any one place with no apparent purpose." Id. at 47. The ordinance was void for vagueness where "[i]t [was] difficult to imagine how any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an `apparent purpose.' " Id. at 56-57. "[T]he vagueness that doom[ed] this ordinance [was] not the product of uncertainty about the normal meaning of `loitering,' but rather about what loitering[was] covered by the ordinance and what [was] not." Id. at 57. The regulations challenged here are not subject to the same uncertainty; the prohibition is clearly delineated.

information." Ward, 491 U.S. at 791. The appellants do not dispute that the signature requirement is content neutral. They argue instead that the requirement is not narrowly tailored and that it forecloses alternative channels of communication.

These appellants represent that they and other participants in the Rainbow gatherings meet as "individuals who admit of no structure for leadership or hierarchy of decision-making." They then contend that the"refusal of the Government, through the guise of this permit scheme, to permit large groups of individuals to gather on Forest Service land, without first organizing and thereafter delegating authority, is unduly burdensome." According to appellants, any government interest served by the permit process "can all be fully served by a system which assesses proposed land uses on a case-by-case basis but does not require an agent for the group to sign a special use authorization." In essence, the appellants would have us hold that in order to satisfy the requirement that a restriction on activity protected by the First Amendment be narrowly tailored, the government is required to omit the signature requirement from the permit scheme. We disagree.

The Supreme Court makes clear in War d that in order to pass constitutional muster, a time, place and manner restriction need not be the "least restrictive means" of vindicating the government's interest. See 491 U.S. at 789-97. Instead it is only necessary that the government "could reasonably have determined that its interests overall would be served less effectively without [the regulation] than with it." Id. at 801. That certainly is the case here.

The interests vindicated by the regulatory scheme in general were detailed by the Court of Appeals for the Fourth Circuit in Johnson:

> The regulations, as well as the Department of Agriculture's comments accompanying them make clear that the regulations serve three purposes. They are designed to (1) "protect resources and improvements on National Forest System lands," (2) "allocate space among potential or existing uses and

8

activities," and (3) "address concer ns of public health and safety."

159 F.3d at 895 (quoting 60 Fed. Reg. 45,258, 45,262 (1995)). The Court then concluded that:

> The permit requirement serves these three goals in a narrowly tailored manner by providing a minimally intrusive system to notify Forest Service personnel of any large groups that will be using the forest so that the personnel, through advance preparation, can minimize any damage that may occur.

Id.

That the interests served by the signatur e requirement in particular would be served less effectively were that requirement eliminated has also been r ecognized. We agree with the reasoning of the District Court in United States v. Masel, 54 F. Supp. 2d 903, 919 (W .D. Wis. 1999):

> With respect to the signature r equirement, requiring an individual to sign a special use authorization as a representative of the group is necessary to ensure that the group will be responsible for the actions of its members as a whole, to give the authorization legal effect and to subject the group to the authorization's terms and conditions. Without the ability to impose terms and conditions on all members of a gr oup, the government would clearly be extremely hampered in its ability to achieve any of its interests. The terms and conditions of a group use permit would have little teeth if they only applied to the individual who signed the permit.

Based on these analyses of the interests served by the regulatory scheme generally and the signatur e requirement in particular, we are convinced that the regulations are sufficiently "narrowly tailored" to serve legitimate government interests.

We are similarly convinced that imposition of the signature requirement "leave[s] open ample alternative channels for communication." War d, 491 U.S. at 791. The regulation does not preclude the use of state or private property for Rainbow Family gatherings. It also does not

impinge upon the right of the Rainbow Family to meet on federal land which does not fall within Forest Service jurisdiction or to gather in groups made up of fewer than 75 individuals. Again, we agree with the District Court's conclusion in United States v. Masel:

> The Rainbow Family has a choice; if it does not wish to perform an act that is antithetical to its core belief [ -- designating a representative to sign a per mit application --] it can hold its gatherings in an area that does not have a permit requirement.

54 F. Supp. 2d at 918.

Because we find that the challenged signatur e requirement represents a r easonable time, place and manner restriction on expressive conduct, we reject the appellants' argument that the requir ement transgresses the guarantees of the First Amendment.6

V.

We turn next to the appellants' challenge to that portion of the regulatory scheme authorizing the For est Service to attach terms and conditions to the grant of a permit. The appellants contend that 36 C.F.R. S 251.56 is unconstitutionally overbroad in that it confers "unbridled discretion" upon representatives of the Forest Service.7 The

_____

6. We reject, too, the appellants' claim that it was "legally impossible" for them to sign a special use authorization. The appellants maintain that because they are merely associated with the Rainbow Family on a loose voluntary basis and lack authority to act on behalf of the group, they cannot sign a special use permit. This ar gument has been raised many times but has never been credited. To r ecognize the appellant's claim of legal impossibility would permit groups, however loosely-organized, to "maintain a fiction that they have no leaders or agents" and thereby to undercut the special use authorization pr ocess. United States v. Masel, 54 F. Supp. 2d at 920. "[B]ecause the attendees at the gathering could have designated [appellants] as [persons] who would sign the permit on behalf of the group without breaking any laws, it was not legally `impossible' for [them] to sign the per mit." Id.

7. This provision reads:

appellants challenge the facial validity of these r egulations; because the appellants did not apply for and did not receive a special use permit, the regulatory pr ovisions at issue were never applied to them.

In evaluating this argument we are guided by the Supreme Court's admonition that "the doctrine of overbreadth is appropriately applied in a facial challenge only where `the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail.' " Kreimer v. Bureau of Police, 958 F.2d 1242, 1265 (3d Cir . 1992) (quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494 (1982)). "Accordingly, `there must be a realistic danger that the [regulation] itself will significantly compromise recognized First Amendment pr otections of parties not before the Court for it to be facially challenged on overbreadth grounds.' " Id.  (quoting Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 801 (1984)). "[A] litigant must establish something mor e than a mere possibility that a particular grant of discr etion might be used unconstitutionally in some other setting." Gannett Satellite Info. Network, Inc. v. Berger, 894 F.2d 61, 66 (3d Cir. 1990).

In Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 751 (1988), the Supreme Court set forth a two-part test governing when a First Amendment facial challenge may be made to an allegedly overbroad licensing scheme. First, the

_____

        (a) General. Each special use authorization must contain:

        (ii) Such terms and conditions as the authorized officer deems
        necessary to (A) Protect Federal property and economic interests;
(B)
        Manage efficiently the lands subject to the use or adjacent
thereto;
        (C) Protect other lawful users of the land adjacent to or occupied
by
        such use: (D) Protect lives and property; (E) Protect the interests
of
        individuals living in the general area of the use who rely on the
fish,
        wildlife, and other biotic resources of the area for subsistence
        purposes; (F) Require siting to cause the least damage to the
        environment, taking into consideration feasibility and other
relevant
        factors; and (G) Otherwise protect the public interest.

As we have noted, the numbering of this section was amended in 1999.

regulation must confer upon a governmental official or agency "substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." 486 U.S. at 759. Second, "[t]he law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." Id.8

The appellants contend that the terms and conditions portion of the special use regulatory scheme, 36 C.F.R. S 251.56, is subject to facial challenge under the test announced in Lakewood because the br oad discretion granted to the Forest Service could, at some future point, be used to chill protected speech by gr oups with disfavored political or social views. The appellants focus particularly on language in the regulation which per mits the Forest Service to impose upon a special use permit terms and conditions deemed necessary "to protect the public interest." We have reviewed the terms and conditions provision against the background of the caselaw and are convinced that this provision does not satisfy the facial challenge requirements set forth in Lakewood.

We consider first the relationship between the terms and conditions provision and expressive conduct, and conclude that any relationship is, at best, incidental. Section 251.56 "does not target First Amendment activities." Masel, 54 F. Supp. 2d at 912. It is "not dir ected narrowly and specifically at expression or conduct commonly associated with expression." Id.

The terms and conditions provision does not permit the Forest Service to ban disfavored speech. Moreover, it is

_____

8. The Supreme Court has left open the issue of whether an individual should be allowed to mount a facial challenge on the basis of unguided discretion in regulating the manner  of speech, instead of excessive discretion in regulating whether speech should be prohibited altogether. See Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989) ("Since respondent does not claim that city officials enjoy unguided discretion to deny the right to speak altogether, it is open to question whether respondent's claim falls within the narr ow class of permissible facial challenges to allegedly unconstrained grants of r egulatory authority.").

applicable to every special use authorization; the clause does not single out a "particular group, activity, or conduct but is directed at all uses of the National For est." Id. at 912–13. Groups seeking to use the national for ests for traditionally expressive purposes such as assemblies, meetings, demonstrations and parades need not obtain special use authorization and are not subject to the terms and conditions provision unless their numbers r each or exceed 75. The special use authorization scheme in general and the terms and conditions provision in particular are "directed not at expression, but at the congregation of large numbers of people in the forest." Id. at 913. When the provision is triggered, it applies with equal force to recreational, expressive and all other special uses of the forest. "Thus, the regulation is closer to a law of general application." Id. at 914. "In this case, the `terms and conditions' provision `provide[s] too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse.' " Id. at 913 (quoting Lakewood, 486 U.S. at 761).

Although we acknowledge that there is some theoretical possibility that the "terms and conditions" provision could be invoked to chill protected speech, we ar e not persuaded that "[t]he risk that Forest Service officials will use nefariously any discretion afforded to them by the . . . provision is . . . great enough to justify invoking the `extraordinary doctrine' that permits facial challenges." Id. at 914 (quoting Ward, 481 U.S. at 794).

Our position with respect to the first pr ong of the Lakewood test is similar to that adopted by the District Court in Masel:

> [S]pecial uses cover virtually the entir e spectrum of outdoor activities, the majority of which have nothing to do with protected expression. In the absence of empirical evidence demonstrating that a significant proportion of the special use authorizations granted by the Forest Service each year are for speech-related activities, there is no basis to conclude that the terms and conditions provision presents a substantial opportunity for censorship on an ongoing basis.

13

54 F. Supp. 2d at 913-14. We thus hold that appellants may not make a facial challenge to the regulation.

In the interest of completeness, we note that even were we to entertain such a challenge, we would r eject it on the merits because the regulation, as interpr eted by the National Forest Service, specifically limits the discretion of the Forest Service to impose conditions dir ected at curtailing or censoring expression. See 60 Fed. Reg. at 45,262 (1995). "In evaluating the constitutionality of a regulatory scheme, we should `presume any narrowing construction . . . to which the law is `fairly susceptible.' " 195 F.3d 538, 542 (quoting Lakewood, 486 U.S. at 770 n.11).

As we have noted, the argument that the ter ms and conditions provisions of the regulation is purposely vague, giving the Forest Service the ability to invoke health and safety concerns as a pretext for censoring expressive activity, is not a novel one. Since 1995, the For est Service has consistently taken the position that discr etion granted to it under the regulations may only be used to further the government's threefold interest in r egulating non-commercial group use of forest land: (1) "protect[ing] resources and improvements on National Forest System lands;" (2) "allocat[ing] space among potential or existing uses or activities;" and (3) "addressing concerns of public health and safety." 60 Fed. Reg. at 45,262 (1995). We agree with the District Court writing in United States v. McFadden, 71 F. Supp. 2d 962 (W.D. Mo. 1999), that the regulation authorizing the Forest Service to impose terms and conditions "necessary to protect the public interest"

> passes constitutional muster, particularly because the Forest Service has specifically identified the "public interests" it seeks to protect . . . .[T]erms and conditions may only be imposed to protect one of the delineated interests. Specifically, "ter ms and conditions that the Forest Service may impose in a per mit are limited to those designed to assure compliance with otherwise applicable health and safety standar ds; to minimize damage to water quality, fish, wildlife, and other environmental aspects of the forests; and to

14

> protect the physical safety of all those in the National
> Forest System."

Id. at 965.9 We agree, too with the District Court's finding
that:

> Regardless of . . . efforts to describe the terms and
> conditions provision attached to a special use permit
> as potentially onerous and oppressive . . . the
> regulations . . . limit the permitting official's discretion
> in an objective, constitutionally sound manner .

Id.

Accordingly, we hold that the appellants' facial challenge
fails.

_____

9. In 1999, the Forest Service promulgated an interpretive rule clarifying
the scope of 36 C.F.R. S 251.56. See 64 Fed. Reg. 48,959 (1999). This
interpretive rule, which essentially embraced the holding in United States
v. McFadden, 71 F. Supp. 2d at 962, r eads in relevant part:

> The imposition of terms and conditions in noncommercial group use
> permits is limited to those designed to further the three public
> interests identified by the Forest Service in promulgating the
> noncommercial group rule . . . .

We are aware that the Court of Appeals for the Ninth Circuit held in
United States v. Linick that, prior to issuance of this interpretive rule,
the
terms and conditions portion of the special use authorization scheme
could have been invoked to attach conditions to the use of a public
forum in advance of actual expression and was, as a result, "facially
invalid." 195 F.3d at 542. The court concluded that the interpretive rule
preserved the constitutionality of the scheme because the scheme, as
limited by the rule, satisfied the criteria applicable to a permissible
"time-place-manner regulation" of expr essive activity. Id. at 543.

The court, however, dismissed the infor mation filed against Linick and
other defendants alleging a violation of 36 C.F .R. S 261.10(k), reasoning
that, because the conduct alleged took place in 1998 and the interpretive
rule was not promulgated until September 1999,"[t]he regulation . . .
gave the Defendants inadequate notice about the danger of being
successfully prosecuted under this newly and narrowly construed
regulatory scheme." Id. at 544.

As we have explained, we do not agree with the Court in Linick that
the terms and conditions portion of the r egulatory scheme is
constitutionally infirm under the criteria set forth in Lakewood.

15

VI.

In a related argument, the appellants contend that the special use authorization scheme is subject to a facial challenge and is unconstitutional because it impinges upon First Amendment rights by not providing for immediate judicial review of overly restrictive sear ch-related terms and conditions which theoretically could be attached to the grant of a permit. The government disagr ees, arguing that, under the regulations, immediate judicial r eview is available to challenge the imposition of terms and conditions: "The Forest Service does not believe that it can r equire exhaustion [of administrative remedies] in the noncommercial group context."

The government's interpretation of its own regulations is entitled to controlling weight, and this particular interpretation has been adopted by at least one court. See, e.g., United States v. McFadden, 71 F . Supp. 2d 962, 966 (W.D. Mo. 1999) (upholding government r eading of regulations to permit applicants or special use permit to go "directly to court" to challenge ter ms and conditions attached to permit.) Appellants do not cite caselaw to the contrary.

We are convinced that the government's construction of the relevant regulations is reasonable and that the judicial review provisions of the regulatory are not constitutionally infirm.

VII.

Because we are convinced that the special use authorization scheme was properly applied to these individuals and is constitutional both on its face and as it was applied here, we will affirm each of the Judgments in this Criminal Case.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

16